**ISLA PETROLEUM CORPORATION and Gasolinas De Puerto Rico Corporation, Plaintiffs,**

v.

**DEPARTMENT OF CONSUMER AFFAIRS and Pedro Ortiz Alvarez, Secretary of the Department of Consumer Affairs, Defendants.**

**PHILLIPS PUERTO RICO CORE, INC., Plaintiff,**

v.

**Pedro ORTIZ ALVAREZ, Secretary of the Department of Consumer Affairs, Defendant.**

**TEXACO PUERTO RICO, INC., Plaintiff,**

v.

**Pedro ORTIZ ALVAREZ, in his official capacity as Secretary of the Department of Consumer Affairs and/or the Department of Consumer Affairs and/or the Commonwealth of Puerto Rico, through Héctor Rivera Cruz, Secretary of Justice, in representation of Mr. Pedro Ortiz and the Department of Consumer Affairs, Defendants.**

**CIA. PETROLERA CARIBE, INC., Plaintiff,**

v.

**Pedro ORTIZ ALVAREZ, in his official capacity as Secretary, Department of Consumer Affairs and/or Department of Consumer Affairs, Defendants.**

**The SHELL COMPANY (PUERTO RICO) LIMITED and Mobil Oil Caribe, Inc., Plaintiffs,**

v.

**Pedro ORTIZ ALVAREZ, in his official capacity as Secretary, Department of Consumer Affairs, and/or Department of Consumer Affairs, Defendants.**

**ESSO STANDARD OIL CO. (P.R.), Plaintiff,**

v.

**Pedro ORTIZ ALVAREZ, in his official capacity as Secretary, Department of**

Consumer Affairs, and/or Department of Consumer Affairs, Defendants.

CARIBBEAN GULF REFINING CORPORATION, Plaintiff,

v.

Pedro ORTIZ ALVAREZ, as Secretary of the Department of Consumer Affairs of the Commonwealth of Puerto Rico, Defendant.

TENOCO OIL CO., INC. and Distribuidora De Gasolina El Coqui, Inc., Plaintiffs,

v.

DEPARTMENT OF CONSUMER AFFAIRS and Pedro Ortiz Alvarez, Secretary of the Department of Consumer Affairs, Defendants.

Civ. Nos. 86–0730 (Jaf), 86–0721 (Jaf), 86–0720 (Jaf), 86–0714 (Jaf), 86–0719 (Jaf), 86–0718 (Jaf), 86–0717 (Jaf) and 86–0681 (Jaf).

United States District Court,
D. Puerto Rico.

June 4, 1986.

On Motion for Stay Pending Appeal
June 10, 1986.

Alvaro R. Calderón, Hato Rey, P.R., Maggie Correa-Avilés, Arturo J. García Solá, McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria, William Estrella, Rodriguez, Lebron & Estrella, San Juan, P.R., Celso E. López, Carlos F. López, Santurce, P.R., José R. González Irizarry, Ana Matilde Nin, McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria, San Juan, P.R., Jaime Sifre Rodríguez, Luis Sánchez-Betances, Cepeda, Sanchez-Betances & Sifre, Hato Rey, P.R., Emilio Peña Fonseca, Noel S. González, Sweeting, Gonzalez & Cestero, San Juan, P.R., Dominguez & Totti, Carlos Romero Barceló, Hato Rey, P.R., Lopez Lay & Vizcarra, Santurce, P.R., for plaintiffs.

Dennis Simonpietri, Marcos Ramírez Lavandero, Ramirez & Ramirez, Hato Rey, P.R., for defendants.

## MEMORANDUM OPINION AND ORDER

FUSTE, District Judge.

These are eight consolidated cases filed by gasoline refineries and wholesalers against the Secretary of the Puerto Rico Department of Consumer Affairs, hereinafter referred to as the Secretary and DACO, respectively. The various cases request declaratory judgment pursuant to Fed.R.Civ.P. 57 and 28 U.S.C. Sec. 2201, and injunctive relief pursuant to Fed.R. Civ.P. 65. Some plaintiffs claim violations

to 42 U.S.C. Sec. 1983 [1] and relief is requested accordingly. It is claimed that certain orders fixing gross margins of profit and establishing a tax antipass-through provision at a given level of the industry, entered by the defendant Secretary of DACO after March 18, 1986 are tantamount to a deprivation under color of state law of plaintiffs' civil and constitutional rights secured by the fifth and/or the fourteenth amendments, United States Constitution. It is further claimed that the orders under attack are unconstitutional acts of deprivation of property without due process of law and, thus, are confiscatory in character. The margin-fixing/regulatory orders relate to the sale of gasoline at the wholesale level.[2] The challenged state action coincides in time with the enactment of Law No. 5, of March 18, 1986, 13 L.P.R.A. Sec. 4030C, which law imposed an additional excise tax on the importation of crude oil on a per-barrel basis. The excise tax, variable in amount depending on the price of crude oil, is a legitimate exercise of Puerto Rico's fiscal autonomy. Law of Federal Relations art. 3 (1917), 1 L.P.R.A. Sec. 3. The excise tax is not under attack; however, the same has been ordered to be absorbed by those plaintiffs which are gasoline wholesalers.[3] One of the margin-fixing/regulatory orders, the first of two orders issued on April 23, 1986, contains an antipass-through provision whereby the excise tax is to be charged against the allegedly exorbitant income of the gasoline wholesalers. The antipass-through provision assumes that the ultimate price paid by consumers at the gasoline pumps shall not be increased by reason of the excise tax.

Plaintiffs claim that the mentioned price control order containing the antipass-through provision, and two additional orders of April 23 and May 20, 1986, are invalid for the reasons already mentioned. These two orders determine gross margins of profit at 8.6 cents per gallon for wholesalers and 17.7 cents per gallon for retailers. Specifically, the May 20 order fixes margins of 8.6 cents and 3.6 cents per gallon for wholesalers, depending on whether they are "big" companies or "small" companies, as defined in the order under Class 1 and Class 2. In addition, it is claimed that the field of gasoline price regulation is preempted by federal policy, embodied in existing federal law, of an unregulated market. The plaintiffs reinstate their arguments of taking of property without due process of law through confiscatory orders, deprivation of equal protection rights, nullity of the regulations for failure to accomplish a legitimate statutory purpose and for vagueness. The substantive due process violations as alleged are compounded by claims of procedural due process violations that, seen in the context of the regulatory scheme, equate to substantive due process violations. It is alleged that the orders are null and void for the Secretary of DACO's failure to comply, for their issuance, with statutory requirements, nullity of the orders because of their retroactive character, arbitrariness, and capriciousness of the Secretary's actions, and gross constitutional deprivations under color of state law impermissible under the constitutional system of government.[4]

---

1. Mindful of *Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.1986), we need additional time to evaluate the evidence received on the issue of 42 U.S.C. Sec. 1983 liability. The trial of this cause was held with the understanding that no evidence of damages for a 1983 action would be presented. In that sense, the Court bifurcated the issue of liability, which we intend to decide as soon as possible.

2. There are three levels of gasoline production and distribution in Puerto Rico, to wit: (1) refinery level; (2) wholesale level; and (3) retail sales level.

3. The old, previous excise tax amounted to some 16 cents per gallon of gasoline. 13 L.P.R.A. Secs. 4010(b) and 4030. The new tax, as of May 1986, added an additional 14.29 cents per gallon, for a total tax of 30.29 cents per gallon of gasoline. The 16 cents are passed as cost to the consumer. As will be seen, the 14.29-cent tax is subject to DACO's antipass-through provision as per regulatory order of April 23, 1986.

4. The sequence of orders for purposes of reader's guidance is as follows:

 (a) Regulation No. 45, of August 29, 1975;

Jurisdiction has been pleaded under 28 U.S.C. Secs. 1331 and 1343. We find that the pleadings in the consolidated cases raise substantial federal question under the Constitution and laws of the United States and, therefore, jurisdiction is present.

The Puerto Rico Manufacturers' Association (PRMA), a prominent, non-partisan entity in this jurisdiction, has been allowed to appear as *amicus curiae*. PRMA's position is against the regulatory scheme. Preemption is alleged to be present.

The court declined to permit a limited number of consumers to file their permissive intervention under Fed.R.Civ.P. 24(b). Said consumers appealed our refusal to allow them to intervene. Appellate emergency relief was denied by the United States Court of Appeals for the First Circuit on May 21, 1986, Misc. No. 86–8022.

Based on our analysis of the testimony and evidence received at trial, we hereby ENTER our Findings of Fact as required by Fed.R.Civ.P. 52. We note for the record that a large portion of the documentary evidence was received in Spanish. We dispensed of the strict application of the local rule regarding translation of documents in order to expedite and have the matter heard and resolved.

### FINDINGS OF FACT

#### The Parties

The gasoline business in Puerto Rico is best defined as a three-level business composed of the refineries, the wholesalers, and the retailers. There are two refineries in Puerto Rico at the present time, one operated by Phillips Puerto Rico Core, Inc. (PHILLIPS), and the other operated by Caribbean Gulf Refining Corporation (CARECO). PHILLIPS only refines gasoline so as to make it available to the next level of distribution, the wholesaler. CARECO operates as a refinery and as a wholesaler of gasoline.[5] Plaintiffs are properly identified as follows:

(a) Isla Petroleum Corporation (ISLA) and Gasolinas de Puerto Rico Corporation (GASOLINAS) are corporations organized and existing under and by virtue of the laws of the Commonwealth of Puerto Rico. They operate in the Puerto Rico market since 1981. ISLA is engaged in the business of wholesale distribution of gasoline to its dealers throughout Puerto Rico. GASOLINAS is engaged in the business of retail sales and wholesale distribution of gasoline throughout Puerto Rico through its stations and dealers.

(b) Phillips Puerto Rico Core, Inc. (PHILLIPS) is a corporation duly organized and existing and authorized to do business in the Commonwealth of Puerto Rico, which operates a petrochemical plant in Guayama, Puerto Rico, where it uses naphtha, a petroleum derivative, as a raw material to produce various petrochemicals. Gasoline is indirectly generated during PHILLIPS' petrochemical manufacturing process, and PHILLIPS sells the gasoline in Puerto Rico to wholesalers which, in turn, distribute it to the retailers.

(c) Texaco Puerto Rico, Inc. (TEXACO) is a corporation organized and existing under and by virtue of the laws of one of the States of the Union and/or the Commonwealth of Puerto Rico. Said corporation is a gasoline wholesaler which, in turn, supplies its network of retailers who operate gasoline service stations.

(d) Cia. Petrolera Caribe, Inc. (CARIBE) is a corporation organized and exist-

---

(b) Regulation No. 45, Amendment 1, of July 23, 1976;
(c) Order of March 26, 1986;
(d) Two orders of April 23, 1986;
(e) Order of May 20, 1986.

**5.** PHILLIPS sells its gasoline to plaintiffs TENOCO, COQUI, and CARIBE. It also supplies ESSO with gasoline under an exchange agreement. ESSO, in turn, delivers gasoline to PHILLIPS in Texas. PHILLIPS also supplies gasoline to CARECO and vice versa. In turn; CARECO supplies 80% of the referred gasoline needed by its marketing division for use by GULF/CHEVRON. The other 20% used by CARECO is supplied by PHILLIPS. CARECO also supplies TEXACO, SHELL/MOBIL, and CARIBE.

ing under and by virtue of the laws of the Commonwealth of Puerto Rico since 1976. CARIBE is involved in the wholesale of gasoline to its network of retailers who operate gasoline service stations in Puerto Rico.

(e) The Shell Company (Puerto Rico) Ltd. (SHELL) is a corporation organized under the laws of England. The same is authorized to do business in Puerto Rico. Mobil Oil Caribe, Inc. (MOBIL) is a company organized under the laws of the Republic of Panama. The same is duly authorized to do business in Puerto Rico. SHELL and MOBIL are separate and independent legal entities, managed by their respective officers. SHELL, through a Servicing Agreement entered into with MOBIL, manages and services MOBIL's business in Puerto Rico. Both entities act as wholesalers of gasoline. SHELL at times imports gasoline. The product is sold to the SHELL/MOBIL network of retailers that operate SHELL/MOBIL service stations in this jurisdiction.

(f) Esso Standard Oil Co. (P.R.) (ESSO) is a corporation duly organized and existing under the laws of the Commonwealth of Puerto Rico. ESSO is involved in the wholesale of gasoline to its network of retailers who operate service stations in Puerto Rico.

(g) Caribbean Gulf Refining Corporation (CARECO) is a corporation organized under the laws of the State of Delaware, duly authorized to do business in the Commonwealth of Puerto Rico. CARECO is primarily engaged in the refining of crude oil and the production and sale of refined petroleum products, including gasoline. CARECO's refining division sells the gasoline to various wholesalers, such as SHELL, MOBIL, CARIBE, and TEXACO. CARECO's marketing division, as wholesaler, sells gasoline and other petroleum products directly to over 270 independent dealers or retailers operating gasoline stations in Puerto Rico under the registered trademarks of "GULF" and "CHEVRON". Both CARECO and PHILLIPS have gasoline ex-change agreements in full force and effect.

(h) Tenoco Oil Company, Inc. (TENOCO) and Distribuidora de Gasolina El Coquí, Inc. (COQUI) are the most-recently organized wholesalers of gasoline in the Puerto Rico market. TENOCO is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Puerto Rico since 1982. It purchases gasoline from PHILLIPS and sells the same to retailers who operate independent service stations in Puerto Rico. TENOCO also sells wholesale to jobbers in the market. COQUI is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Puerto Rico since 1982. COQUI's business is similar to that of TENOCO.

The incumbent of the Department of Consumer Affairs of the Commonwealth of Puerto Rico is Pedro Ortiz-Alvarez. Mr. Ortiz-Alvarez became Secretary of the Department on March 26, 1986. His predecessor, Carlos J. López-Feliciano, was Secretary of DACO commencing in January 1985. He was appointed Superintendent of Police and left DACO on March 3, 1986. The Department's Organic Act is contained in 3 L.P.R.A. Secs. 341–341v (1973). The gasoline market, as it relates to DACO, is further regulated by more recent legislation containing specific legislative intent on the subject of gasoline. *See* 23 L.P.R.A. Secs. 1131–1135 (1978). The Secretary is being sued in his official and personal capacity as per specific allegations in the various complaints and/or amended complaints on file.

### Existence of Gross Margin Standards Under Federal Regulations

Prior to January 20, 1981, each plaintiff, except TENOCO and COQUI, which came into being after said date, were subject to the federal petroleum pricing and allocation regulations under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. Sec. 751 et seq. (EPAA). Under regulations promulgated under the EPAA, the United States Department of Energy set maxi-

mum gross margins of profit of 8.6 cents per gallon and 17.7 cents per gallon for wholesalers and retailers, respectively. The federal regulation labeled the wholesalers as resellers under the federal regulatory scheme. 10 C.F.R. Sec. 212.93 (1980). Those regulations provided guidance regarding the methods by which acquisition costs and gross profit margins were to be calculated. 10 C.F.R. Sec. 212.92. In the case of wholesalers, the federal regulations explicitly stated that the reseller (wholesaler) could not charge a price in a sale for any type or grade of gasoline which exceeded the most recent acquisition cost, plus 8.6 cents per gallon, *plus tax cost* attributable to the sales of that type or grade of gasoline. Beginning June 15, 1980, the Department of Energy was to adjust semiannually the fixed cent-per-gallon amount to reflect the gross national product deflator factor. Tax cost was defined *to include* the cost of federal, local, and *state excise*, sales, and other attributable taxes related to the gasoline sales and computed on a per-gallon basis. The factor of cost *was not* to include federal, state, and local income, property or franchise taxes. Acquisition cost for resellers (wholesalers) was the cost of product in inventory computed pursuant to the seller's historical accounting practices on a per-gallon basis, including transportation cost of bringing the product to inventory. 10 C.F.R. Sec. 212.92(b) (1980). By virtue of presidential executive order, President Reagan lifted federal price controls on crude oil and refined petroleum products effective January 28, 1981. Exec. Order No. 12287, 46 Fed. Reg. 9,909 (1981).

Before federal deregulation became effective, and specifically on August 29, 1975, DACO promulgated Regulation No. 45, which intended to implement certain authority of the Secretary of DACO under 23 L.P.R.A. Sec. 734 and DACO's enabling act, 3 L.P.R.A. Sec. 341e, to regulate the prices of gasoline, kerosene, and diesel fuel. The regulation classifies the products as of "prime necessity". Obviously, at that time DACO lacked authority to control the prices of petroleum and petroleum-derived products, inasmuch as the EPAA had preempted the field. 15 U.S.C. Sec. 751. Puerto Rico was treated as a state under said federal law. 15 U.S.C. Sec. 752(7). Price Regulation No. 45 was amended on July 23, 1976 by its Amendment No. 1 to reflect and accept the preempted status of the industry. Amendment No. 1 provided that the authority there contained would not become effective until the lifting of federal price controls and allocation controls. Thereafter, Regulation No. 45, Amendment No. 1, was the document to which the local industry and DACO referred to in the field of local gasoline regulation. (See footnote 4 to this Order). By its express terms, the regulation became effective upon the lifting of federal price controls on January 28, 1981. Our examination of Regulation No. 45 and its Amendment No. 1, seen in light of the evidence received at trial, shows that the same does not contain a specific price/margin-of-profit regulation. The regulation does not set specific margins of profit. In this sense, articles 2, 3, and 4 of the regulation are most important. They show that after January 28, 1981, DACO understood it *could* regulate prices as per articles 2, 3, and 4, to wit:

Article 2—Purposes

This regulation controls the prices and maximum margins of profit in the sale of gasoline, kerosene, and diesel fuel at all levels of distribution, including refineries, by establishing the mechanism by means of which the Secretary will set and revise said prices. In addition, the prior regulation related to this matter is repealed.

Article 3—Declaration of Sale Prices:

Once the federal price controls over products regulated herein cease, and while the Secretary has not set the maximum prices of the product in question, no person can increase the sale price of the product unless he informs the Secretary in writing of the proposed change with at least 15 days' prior notice to the date the change comes into force.

Article 4—Price Orders:

On his own initiative or at the request of an interested party, the Secretary can issue orders fixing prices and maximum margins of benefit in the sale of the regulated products at any distribution level in accordance with the following criteria:

. . . . .

(h) gross reasonable benefit to the wholesaler and the dealer

(1) reasonable margin for operational costs;

(2) reasonable net benefit margin;

(3) turnover of the product;

(4) adjustment to the gross benefit margin considering the turnover of the product.

(translation ours).

As it can be plainly seen from Regulation No. 45, as amended, the Secretary understood that he had the power to issue price/regulatory orders. Regulation No. 45 *per se* was not a price order or price regulation.

DACO's policy regarding the implementation of Regulation No. 45, as amended, accrued and commenced to be expressed after January 28, 1981, when federal controls under the EPAA ceased to exist. The credible evidence is to the effect that former Secretary Héctor Ricardo Ramos-Díaz informed the public of the existence of Regulation No. 45, as amended, as a result of the expiration of federal controls. However, our careful examination of defendants' exhibits 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18, does not support the conclusion that a formal order was ever entered by DACO adopting the 8.6 and 17.7–cent margins last enforced by federal regulation. The testimony received by the Court from former Secretary Carlos J. López-Feliciano and from the vast majority of the witnesses so confirms. However, there is evidence that DACO and the wholesalers/retailers adopted informally *as a reference point for future regulation* the federal margins as they existed on January 28, 1981. As a matter of fact, the press release of former Secretary Ramos-Díaz, dated February 23, 1983, defendants' Exhibit 14, at page 10,

leaves no room to doubt that as of that date DACO had only made use of Article 3 of Regulation No. 45, as amended, seen in light of the guidelines existing at the time of federal deregulation. The press release states in its page 10, first and second paragraphs:

The price system that we have imposed can be summarized in the two basic mechanisms that Regulation 45 (amendment 1) provides, to wit: (1) that no person can raise the prices at which he sells the products mentioned without notifying the Secretary of the proposed increase with 15 days' prior notice (Reg. 45, amend. 1, art. 3), and (2) that on its own initiative or at the request of an interested party, the Secretary can issue orders fixing and revising the prices and margins of maximum benefit of the regulated products at any or all the levels of distribution following a series of guidelines (Reg. 45, amend. 1, art. 4).

Up to the present, this Agency has only made use of the first of these—that established in article 3 of the Regulation—adhering to the same the margins of benefit that were enforced at the time the federal controls ceased. In this way we supervise that the prices of sale of gasoline be maintained within the established margins and that any increase be notified accordingly. (Translation ours).

The truth of the matter is that DACO never approved a price order in accordance with the procedural requirements of Commonwealth law to implement and enforce the federally-established 8.6 and 17.7 cent-per-gallon gross margins of profit for wholesalers and retailers as a standard in reviewing wholesale or retail prices. Our notes of the testimony of former Secretary Carlos J. López-Feliciano so confirm unequivocally. The actual Secretary and defendant had to admit, when put in a non-elusive position, that this was the case. However, there is no doubt in our mind that the 8.6 and 17.7 cent-per-gallon margins were used to overlook the industry as if their presence in the historic legal con-

text could result in actual price regulation under Regulation No. 45, as amended.[6]

Subsequent to the lifting of federal petroleum pricing regulations, the petroleum industry in Puerto Rico did not comply with Regulation No. 45, Article 3, by submitting proposed price increases to DACO fifteen days prior to the requested effective date of such increases. There are, however, a few instances where DACO flexed muscle against the industry on the basis of Article 3 and some cases where the industry came to DACO to confess having gone beyond the former guidelines. To that effect, we received in evidence defendants' Exhibits 10, 11, 12, 13, 19, 20, 34, 35, and 36, where, on a very limited number of occasions, DACO exchanged correspondence with the companies on the subject. On two occasions, in 1982 and 1983, SHELL pleaded *mea culpa* and voluntarily adjusted its prices. Defendants' Exhibits 19, 20. On one occasion, ESSO threatened a retailer with contract cancellation for charging high prices for gasoline. Defendants' Exhibit 33. In summary, only Article 3 of Regulation No. 45 was in force. No price/margin-fixing orders as per Article 4 of Regulation No. 45 were ever approved. The industry played the game with DACO by not going overboard on price setting, bearing in mind the historical federal margins and DACO's announced power to regulate. For the period 1981 to 1986, the industry in this sense was a free-competing market subject to the caveats mentioned herein.

During the period of 1983–1984, there was by no means a vigorous enforcement of Regulation No. 45. Enforcement became more of a monitoring effort on the part of DACO. Prices remained relatively stable. The personnel to gather data, conduct economical studies, regulate, and monitor simply was not available. DACO never withdrew Regulation No. 45, as amended. DACO never formally implemented enforcement procedures to penalize offend-

ers. There is evidence that no offenders were charged or fines imposed or paid. There is evidence that DACO conducted no study directed to implement Article 4 of Regulation No. 45, as amended, during the years 1981 to 1984. The industry relied on the fact that they had at least a *de facto* -protected margin of profit of at least 8.6 and 17.7 cents at the wholesale and retail levels, presumably as these margins were defined in the federal regulations that ceased to exist in January 1981. Be it remembered that the federal margins allowed for the given margins to be gained on the basis of the most recent acquisition costs plus the taxes attributable to the transaction, including the cost of federal, local, and state excise and sale taxes and other attributable taxes related to the gasoline sales, but not including federal, state or local income, property or franchise tax. There is evidence that DACO up to the end of year 1984 was not in a position to enter a price/margin-fixing order related to margins of profit. The court was not presented with such an order or with studies that would enable DACO as of 1984 to enter said orders taking into consideration gross reasonable benefit to the wholesaler or dealer, reasonable margin for operating costs, reasonable net benefit margins, turnover of the product or adjustment as a result thereof. No evidence of an adjustment based on the GNP deflator factor was presented in evidence.

With this background in mind, we now look at the historic legal events of 1985–1986 which bring about this litigation. In January 1985, Carlos J. López-Feliciano became the Secretary of DACO. By mid-July 1985, Mr. López-Feliciano determined that DACO should resume active enforcement of the policy of the previous administration regarding the fifteen-day notice requirement of change in prices as per Regulation No. 45, Article 3. To that effect, Secretary López-Feliciano sent a July 1985 report to the interagency committee created to study the gasoline industry as per 23 L.P.R.A.

6. Obviously, if anyone claims that the federal margins became effective in Puerto Rico as law by regulation, then, of course, all the parameters, definitions, cost, and expense data related thereto also was in effect. This, of course, is not the case that was presented to the Court.

Sec. 1131. We carefully examined the report, defendants' Exhibit 31, in light of the September 1985 communication to wholesalers, excepting TENOCO and COQUI, Exhibits 22–32. There, we find a restatement of the historical deregulation described in these findings. At page 5 of the report, Exhibit 31, we find a restatement that only Article 3 of Regulation No. 45, as amended, was in full force and effect and that DACO kept its vigilance and/or watchfulness of the wholesalers and retailers so as to avoid them from exceeding the historic federal margins of 8.6 and 17.7 cents per gallon. There, at pages 6 to 9, inclusive, Secretary López-Feliciano renders to the interagency committee an update on the status of the industry as of July 1985. The status of the pricing situation of gasoline was not to be blamed on the wholesalers or on any wrongdoing on their part. It was stated that prices for the period 1982 to March 1985 declined to then increase slightly due to causes mainly attributable to world market conditions. He further expressed his concern that due to world market conditions and low inventory of gasoline kept by stateside refineries, the prices were not coming down as expected. He further suggested that mechanisms be studied to allow the consumer to participate in the savings represented by lower crude costs. *Most important, it was stated that the Puerto Rico retailers were not pleased with the fact that some retailers were selling their gasoline at retail costs lower than 17.7 cents, that the retailers' margin of profits was ranging from 3.12 cents per gallon to 12.4 cents per gallon, and that this sector of the industry was depending on competitive pricing. As a result thereof, the retailers wanted an* *order to fix minimum prices for the sale of gasoline* and that the incentive programs by wholesalers to retailers on the sale be evaluated.[7] The memorandum rested by stating that the interagency committee was to establish public policy to follow in the future to guide the industry accordingly.

Although we do not have the benefit of the resulting interagency committee recommendations on future policy, it is a known fact that in the latter part of 1985, DACO commenced to look into the profit margins that were being realized by wholesalers. Information requests were sent to all companies at the wholesale level. Information was gathered and, *even though at the beginning of 1986 the study was not complete,* DACO concluded that the margins of profit of wholesalers ranged from a low figure of 6.90 cents per gallon to a high of 16.76 cents per gallon. As stated before, in response to a request by the Retail Gasoline Dealers' Association, hearings were convened on January 30, 1986, to obtain information from the companies as to the level of their margins and the reasons therefor. While the Retail Gasoline Dealers' Association withdrew its request, DACO held the hearings and continued to examine the margins of profit of wholesalers. DACO concluded and so informed the Legislature of Puerto Rico, that while the price of a representative grade of crude oil had declined between November 1985 and February 1986 and the average refiner price had also declined, the average price of Puerto Rico's wholesalers had not declined as expected. It was concluded that the wholesalers' margins of profit were excessive.[8] To that effect defendants presented

---

7. The Court has examined the public record of hearings held by DACO at the request of the Retailers' Association on January 30, 1986. The transcript was part of one of defendants' exhibits, but remains unnumbered. There, the retailers complain of wholesalers as enemies of consumers, having by no means the characteristics of "sisters of charity." Transcript at 41. It is obvious that the retailers who wanted an order fixing minimum prices are no sisters of charity either.

8. The Court received the testimony of Secretary of Treasury Juan Agosto-Alicea. His testimony was characterized by his good professional standing in the community. He admitted without hesitation that DACO's information was relied upon by Treasury. It was "overall" information. No breakdown by companies was given. Of course, Treasury assumed that DACO had done its job. Those called upon to review this Order are directed to defendants' Exhibits 1, 2, 3, and 6 (irrespective of the fact that they were admitted for limited purposes), and Exhib-

in evidence a series of exhibits as summaries under Fed.R.Evid. 1006, only admitted by the Court for limited purposes under Fed.R.Evid. 105. The summaries were offered without laying the proper foundation and without making the supporting documents available for inspection. In any event, the Court admitted the summaries for the limited purpose of proving that the Secretary considered the summaries in the rulemaking process. These are defendants' Exhibits 1, 2, 3, and 6. These exhibits were prepared by an employee of DACO, Carlos Lasanta. Mr. Lasanta holds a Bachelor's Degree in Business Administration from the Interamerican University. He directs the Division of Economic Studies of DACO. During the tenure of Carlos J. López-Feliciano as Secretary of DACO and *after* January 1985, he became involved in the gasoline regulation. His testimony shows that the witness is a well-intended person, but not a person qualified to conduct studies on the economics of the petroleum industry for regulatory purposes. We find that Mr. Lasanta's testimony was of little assistance to the Court. He gave no solid ground upon which we could find that DACO had studies of value to rely upon. This particular situation motivated our ruling not to depart from the strict compliance with Fed.R.Evid. 1006. If the nonavailable supporting data to the summaries was primarily Mr. Lasanta's work, the reliability of that evidence was to be put in question.

Relying on the information supplied by DACO and considering rapidly-declining crude oil prices and the alleged failure of cost reductions to be passed through fully to Puerto Rico's consumers, the Puerto Rico Legislature enacted Law No. 5, of March 18, 1986, 13 L.P.R.A. Sec. 3040C, to impose an additional excise tax to the existing 16–cent excise per gallon of gasoline. 13 L.P.R.A. Secs. 4010(b) and 4030. The new excise tax is imposed on crude oil and refined petroleum products. The amount of the tax was designed to vary, depending on world prices of crude oil, as determined by certain specified indices, in the second month prior to the month in which the tax is imposed. For the month of April 1986, the tax was set at $5.00 per barrel or $0.119 cents per gallon of gasoline. In May 1986, the tax was set at $6.00 per barrel or $0.1429 cents per gallon of gasoline. For the wholesalers who purchase gasoline from PHILLIPS and CARECO as refineries, the tax is included in the price of the gasoline purchased. Those wholesalers who import gasoline into Puerto Rico, such as SHELL, are required to pay the tax on such imports directly. The level of the tax in future months is at present unknown, inasmuch as it varies inversely with world crude prices. The record indicates that world oil prices have increased in the past two months.

The legislative intent behind Law No. 5 provides, in its pertinent part, as follows:

[S]ince the descent in the world price of crude oil began, and today it is below $13.00 per barrel, no pattern whatsoever has been observed that indicates that the reduction has also been favorable to the Puerto Rican consumer. On the contrary, in Puerto Rico the price of gasoline, among other consumer goods, has remained stable. This means that petroleum importers or distributors have increased their profits without a sufficient part of that price savings having been transferred to the consumer.

Faced with this reality, the State has the obligation of adopting measures for guaranteeing that the benefit obtained from the drastic drops in world petroleum prices is also transferred to the entire Puerto Rican public. *This will be achieved in part through the imposition of the excise provided in this law,* whose purpose is to channel resources for social welfare works and services, *and on the other hand, using governmental mechanisms for price control, if the businesses do not channel them on their own initiative.*

its 27, 28, and 37. They constitute DACO's financial data. The constitutional rights of par-

ties cannot be curtailed on the basis of such data.

Therefore, the purpose of this law is to transfer a portion of the benefits represented by the drop in crude oil prices to all consumers, through public works and services. At the same time, without affecting today's prices in the marketplace, nor the fair, reasonable profit margin of the petroleum producing and distributing companies, each Puerto Rican consumer will receive, in an adequate fashion, the benefit of a substantial drop in the price of gasoline and other derivative products.

Law No. 5 at 1 (emphasis added).

Faced with the legislative intent, whereby an excise tax was being imposed and, on the other hand, governmental mechanisms for price control were to be exercised to prevent the consumer from having to pay for the tax, DACO and the Department of Treasury implemented a plan to accomplish such legislative intent. Be it remembered that up to this time, Regulation No. 45, Article 3, was in effect *only requiring* a fifteen-day notice on price increases. No price fixing order *per se* existed as of the date the law came into effect on March 18, 1986.

The evidence shows that the general public was fearful of the tax and its consequences. There had been public debate on whether the legitimate exercise of the power of fiscal autonomy would eventually freeze or reduce gasoline cost to consumers. The evidence shows that faced with strong public concern, the Department of Treasury published the following advisory in the local newspapers:

March 17, 1986.

### IMPORTANT FACTS REGARDING THE REDUCING EXCISE TAX FOR PETROLEUM

#### Background

Between November, 1985 and February of this year, the price of petroleum went down on a worldwide level from $30 to $14 per barrel.

This has caused a dramatic reduction in the price of gasoline worldwide. Notwithstanding, until recently Puerto Rico had not noticed a proportional reduction in the price of gasoline.

By means of new legislation, an excise tax has been enacted to reduce the excessive profits of the dealers in oil ("petroleras") and wholesaling companies which are being derived as a result of the reduction in the cost of petroleum.

**What is the purpose of the reducing excise tax?**

That the people of Puerto Rico share in the benefits of the decrease in the price of petroleum.

**Who is going to pay this reducing excise tax?**

The dealers in oil ("compañías petroleras") will pay the Government of Puerto Rico part of their excessive earnings due to the reduction in the price of petroleum.

**What use will be given to the funds collected through the reducing excise tax?**

The collected funds shall be for the benefit of citizens through public works and government services.

**How are the electricity rates to be affected?**

With the decrease in the price of petroleum, the consumer is already receiving the benefit. The tariffs have decreased in 15% and it is expected that they will go down 40%.

**Will the price of gasoline increase as a result of this reducing excise tax?**

*No, DACO will make sure that the price of gasoline is not raised.*

**What is the position of the Gasoline Retailers' Association?**

"Contrary to the position taken in these public hearings by the petrochemical companies in opposing this bill, we, in just recognition of the need of resources by the Government of Puerto Rico, and recognizing that it is a better alternative that the money earned in excess by the petrochemical companies, the moneys earned and those to be earned if the Government does not stop them, be used for the benefit of our Government to

realize those public works beneficial to the people of Puerto Rico.

This measure, coupled with adequate supervision *over the abusive earnings* of the petrochemical companies, taking as an example the present situation whereby they are earning more than 20 cents in excess per gallon, allows the Government to obtain the 9.5 cents of the excise tax and more so, the gasoline should decrease more than 10 additional cents per gallon at this moment."

**Statement Gasoline Retailers' Association of Puerto Rico before the House Committee on Finance, Commerce, and Industry.**

**The citizen will not pay more for gasoline; and the funds collected by means of this reducing excise tax will be for the benefit of the people of Puerto Rico.**

Orientation Message

Commonwealth of Puerto Rico

**DEPARTMENT OF TREASURY**

(Translation ours; emphasis added).

Thereafter, on March 26, 1986, DACO, through defendant Secretary Pedro Ortiz-Alvarez, issued an order where it reasserted that pursuant to regulation No. 45, Article 3, no price increase could take effect unless it had been submitted to DACO for approval fifteen days prior to the effective date of the increase.

On April 23, 1986, DACO issued two orders.[9] The first order determined that the Law No. 5 new excise tax imposed on crude oil and derivatives like gasoline could be passed through by the refineries to the gasoline wholesalers. The gasoline wholesalers were forbidden, by virtue of the order, to treat as a tax cost chargeable to retailers, the import of the excise tax. The net result was a determination by DACO

that the parties chosen to absorb the tax were the wholesalers with an antipass-through provision operating against them. This order was, for all material purposes, a price-fixing/regulatory order. The second order of April 23, 1986 issued by DACO forbade wholesalers to sell at *any price* higher than the price they had charged on March 31, 1986, without the express approval of the Secretary. The April 23 orders, as well as the March 26 order, were issued without notice and hearing as required by 23 L.P.R.A. Sec. 341g(a), 3 L.P.R.A. Secs. 1041–1059, and/or 3 L.P.R.A. Sec. 341e, seen in light of Sec. 341g(a). A hearing was to be held *a posteriori* to allow wholesalers to present evidence and argument on, among other things, the course that future regulation on the subject was to take. The plaintiffs received the April 23 orders.

Although there is no evidence that at any time before the April 23, 1986 orders any wholesaler was forced to sell the gasoline under cost, there is overwhelming evidence on this record that the timing of the April 23 orders coincided with increased acquisition costs for all wholesalers and these increases in cost, coupled with the imposition of the tax at the wholesale level by DACO, and the freezing of prices as of March 31, 1986, as per the two orders of April 23, did cause plaintiffs to have to sell below their acquisition cost of gasoline on a current basis, beginning in late April and up and until the date of trial.

Plaintiffs TENOCO and COQUI sought administrative relief from the April 23 orders by petition dated April 28, 1986. The Secretary responded in an order issued directed to those two companies, dated April 29, 1986. There, the Secretary *admitted* publicly that these two companies did not

---

9. During the first trimester of 1986, and since the wholesalers were operating under a *de facto* deregulated free-competition market, as the price of gasoline went down, the competitive forces lagged and the downward tendency in prices did not reach the consumer as fast as DACO expected. In this sense, it can be said that the companies had profit. One could say simply profit or excessive profit, but the descrip-

tion is immaterial. There was no frame of reference for the "excessive" determination. "Excessive" is a relative term. The conditions as observed are typical of a free market—as prices go down at a higher level in the distribution of goods, competing interests watch each other until matters settle. The same occurs with price increases. Nothing extraordinary occurred during January-March 1986.

increase their per-gallon gross margins during the first three months of 1986. The Secretary further noted that these two companies had added an important competitive element in the gasoline market.[10] Two orders, similar in text, were issued, one directed to TENOCO and the other to CO-QUI, both bearing the date April 29, 1986. The orders are most revealing and their identical text is transcribed herein:

### RESOLUTION AND ORDER

The above captioned company is engaged in the distribution of gasoline in Puerto Rico. It has objected the application to it of the Order issued by the Department of Consumers Affairs to gasoline wholesalers, published on April 23, 1986.a

The situation set forth by this company deserves special attention. *It is a small company, economically weak, that distributes a small portion of gasoline which is sold in Puerto Rico. During the past years it has added an important competition element in the gasoline market and has, in effect, stimulated lower prices for the consumer.*

*The gross margin of profits of this company has normally been under the 8.6¢ per gallon, and occasionally it has been substantially lower. The evidence gathered up to now does not allow to conclude that they withheld excessive earnings during the first three months of 1986 as a result of the reduction in the prices of crude oil.* Their prices for March 31, 1986 were lower than those offered by the companies with higher volumes of sales.

In view of the foregoing, we hereby authorize the above-captioned company to establish their prices of sale to retailers at the same level in which the competitors sell leaded and unleaded gasoline. Their prices must not allow a margin or profit higher than 8.6¢ per gallon. *Experience shows us that this company*

*makes a special effort to maintain its prices underneath those of its competitors.* Nevertheless, for the purpose of verifying that it maintains that pricing policy, they are required to file at this office, on Wednesdays of every week, copies of the bills of five (5) sales carried out on Mondays and five (5) on Thursdays.

. . . . .

Given in San Juan, Puerto Rico, on April 29, 1986.

Signed Pedro Ortiz Alvarez; Pedro Ortiz Alvarez, Secretary.

The orders, while recognizing the patent and obvious injustice caused as a result of the April 23 orders, did not provide satisfactory relief. This is so because TENOCO AND COQUI had been operating under Regulation No. 45, Amendment 1, under free market competition conditions. They had priced their products below the prices of the larger wholesalers in order to be competitive and the prices of these competitors were being held down by the application of the second April 23 order directly to them. In other words, the April 23 orders and the April 29 order imposed a hardship on TENOCO and COQUI directly, inasmuch as the absorption of the tax without "pass through" and the raise in costs, seen in light of the price freeze in a market that was *de facto* deregulated, forced them to sell under cost in order to compete with other companies and be able to supply their customers.

On May 12, 1986, DACO conducted *ex post facto* hearings to deal with the April 23, 1986 regulation. Plaintiffs TENOCO and COQUI participated in the hearings in a meaningful way. The other plaintiffs announced that they would not participate because they had filed their complaints in the instant proceeding.

On May 15, 1986, we entered an order in the consolidated proceedings, entitled "Minutes of Proceedings and Order", Docket

---

**10.** This constitutes an admission that the market was fiercely competitive before the regulations at issue were enacted.

Document No. 14. There, we denied the second request by TENOCO for a temporary restraining order. In so doing, we reaffirmed the earlier denial by Chief Judge Pérez-Giménez. We were of the view that the broad picture had to be presented to the court. We directed DACO to pass upon and decide on TENOCO's request for reconsideration of resolution and order subscribed by counsel on May 8, 1986. The Court expected DACO's prompt attention to the matter before the scheduled pretrial conference and hearing set for May 20–21, 1986. In the event that no action was taken by DACO as directed by us, we would understand that DACO had denied the requested relief.

 The pretrial conference was held in open court as scheduled on May 20, at 4:30 P.M. Extensive argument was heard. All kinds of proposals to solve the dispute were considered. That same day, May 20, DACO issued an order which did not address the subject matter to which we had directed their attention. The order was a new order which set aside the second April 23, 1986 order fixing margins of profit and freezing prices at levels of March 31, 1986. The new order regulated anew the gasoline wholesale sector of the industry.[11] The May 20, 1986 order stated that all wholesalers whose average gross margins from the beginning of 1986 to the date of the order

did not, in effect, exceed 8.6 cents per gallon, could continue to obtain up to an 8.6 cent gross margin. The companies identified as being in this Class 1 category were TENOCO, COQUI, and CARIBE. All wholesalers whose average gross margins from the beginning of 1986 to the date of the order did, in effect, exceed 8.6 cents per gallon, were permitted to obtain up to 3.6 cents gross margin until they could show the Secretary and defendant Ortiz-Alvarez that their average gross margin from the beginning of 1986 is lowered to 8.6 cents, at which time they would be permitted to obtain an 8.6–cent margin. The companies tentatively identified as being in this Class 2 category were TEXACO, SHELL/MOBIL, ESSO, and GULF/CHEVRON. GASOLINAS/ISLA was not included in the order, presumably by inadvertent error. At the time trial concluded, no additional order was made known to the court that would cure the exclusion.[12]

In order to "stabilize" for the consumer the price impact of the order and to maintain the historical (not legal) price differential between the major companies and the small wholesalers, DACO activated a fund known as "Fund for Prime Need Articles", 23 L.P.R.A. Secs. 734, 745, from which the gasoline prices to Class 1 wholesalers would be subsidized in the amount of ten cents per gallon, and Class 2 wholesalers

11. At the pretrial hearing, counsel for the defendants argued that the challenged second April 23 order had been rescinded and that the litigation was moot. In turn, defendants elected to file a motion to dismiss, rather than a responsive pleading directed to meet the issues of the complaint. We decided to take plaintiffs' pleadings as amended to include the May 20, 1986 order and entered for defendants' benefit a general denial of plaintiffs' allegations. We preserved defendants' motion to dismiss and took all argument and allegations there raised as affirmative defenses. Fed.R.Civ.P. 8(f). We understood it to be our duty to beware of efforts to defeat injunctive relief by the issuance of a new order that clearly did not solve the dispute. The proposed reform did not demonstrate that there was reasonable expectation that the wrong would be discontinued. The record developed at the pretrial conference convinced us that defendants' proffering of mootness did not suffice to make the case moot. Courts have power

to grant injunctive relief even if one party claims discontinuance of the alleged illegal conduct. The purpose of an injunction is to prevent future violations. The record clearly demonstrated that the relief was needed. There existed cognizable danger of recurrent violations, more than mere possibilities. We so found at trial. See United States v. W.T. Grant Co., et al., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). There was no clear proof of vindication of rights or abandonment of the questioned practices. Cf. United States v. Oregon State Medical Soc., 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952).

12. The 8.6 cent-per-gallon margin for highly-competitive wholesalers like CARIBE, TENOCO, COQUI, and even GASOLINAS/ISLA, was no solution to the problem. A $20 margin would not have helped. Their threshold margin was that of competition. For them to compete, they had to undersell others.

would be subsidized by five cents per gallon. Secretary Ortiz-Alvarez could not explain at trial how this emergency fund would operate; however, he offered an *impromptu* solution when he stated that one way of solving the problem would be that the payments on the subsidy would be given in the form of credits on the excise taxes owed by the refineries and importers of gasoline under Law No. 5, so that no company would be required to make an out-of-pocket payment in order to effectuate this program.[13] Companies could request special relief from the May 20, 1986 order and DACO would convene hearings within five days of any request. Furthermore, additional *ex post facto* hearings were set for June 2, 1986. On said occasion, DACO would receive comments from all interested persons on the appropriateness of the May 20, 1986 order.

Surprisingly, this third price-fixing order confirms that the two April 23 pricing orders, as well as the May 20 order itself, were based on anything but soft data. The order requested parties to come forward with the hard data that any rule-making body would consider *before* regulating, to wit:

(1) Detailed evidence of costs and operating costs;

(2) evidence to demonstrate the excess profits achieved during the first three months of 1986 and evidence of how said excess profits have been reduced during the second trimester of 1986;

(3) evidence of whether the operating costs of wholesalers have increased significantly since 1981 when federal controls ceased to exist and evidence of the reasons behind such increases;

(4) evidence of whether there exist significant differences between the costs of operation of wholesalers in Puerto Rico versus wholesalers in Continental United States, and evidence of the reasons behind such differences;

(5) evidence of why the margins of profit of wholesalers increased substantially during the first trimester of 1986 while its costs decreased, and what measures, if any, DACO should consider to avoid this from happening again;

(6) evidence of how changes are to be made to the order of May 20, in order to achieve the following purposes:

(a) force the wholesalers to return *unreasonable* profits obtained during the first trimester of 1986;

(b) stabilize the price for Puerto Rico consumers;

(c) attain vigorous competition, including the safeguarding and viability of the small wholesalers' survival in the market;

(d) achieve free competition as soon as possible.

We find as a matter of fact that in the circumstances *of this case* plaintiffs did not have sufficient opportunity to be heard. Advance notice and hearings of some significance were not provided. The March 26 order, seen in light of the two orders issued on April 23 and the May 20 order, dealt with matters of sufficient importance in the field of price and margins-of-profit regulation of the gasoline industry so as to require these hearings. The May 12, 1986 hearing announced in the second order of April 23, 1986 had no meaningful purpose. TENOCO and COQUI participated; DACO had the benefit of the allegations before this Court. The evidence received at trial convinces us that these hearings had no meaningful purpose of regulating gross profit margins in the wholesale/retail of gasoline. DACO and defendant Pedro Ortiz-Alvarez had their mind set on the remedies to be afforded. The orders had no legitimate regulatory purpose. They simply obeyed to DACO's public commitment

---

**13.** We do not question taxing authority, but, as a matter of curiosity, we looked for the legality of the proposed offset. We find no authority in law for the DACO Secretary's proposed arrangement. We also looked at the emergency fund statute (Fund for Prime Need Articles), 23 L.P.

R.A. Sec. 734. By no stretch of the imagination such fund could be legally used to subsidize gasoline wholesalers. However, this we only comment on. It is for DACO to explain to taxpayers the legality or morality of the use of such fund.

of keeping the lid tight on the gasoline industry irrespective of consequences, so as to accomplish the publicly-made promise that DACO would not allow the prices of gasoline to go up. In so doing, DACO disregarded substantive due process considerations in that the confiscatory and illogical results of the mentioned orders were imposed irrespective of the economical consequences on plaintiffs as outlined herein. In so doing, DACO disregarded procedural due process, which, as a matter of fact, compounded the substantive due process violations in issuing price fixing/regulatory orders without regard to the logic or consequences of its actions.[14]

The evidence indicates that defendant Secretary Pedro Ortiz-Alvarez relied principally on information and studies provided to him by Mr. Carlos Lasanta, whose qualifications we cannot responsibly accept. The evidence further confirms that even though defendant Pedro Ortiz-Alvarez claimed to have before him prior to entry of the April 23 orders defendants' Exhibits 1, 2, 3, and 6, his testimony was contradicted when Mr. Lasanta had to admit that Exhibits 3 and 6 were prepared after the April 23 regulation and after the April 29 resolution and order concerning TENOCO and COQUI.

The testimony of the defendant Pedro Ortiz-Alvarez and his immediate predecessor Carlos J. López-Feliciano merit a special finding. They were the two secretaries of DACO who intervened directly with the challenged regulation.

The testimony of the former Secretary López-Feliciano was straightforward testimony. The same was of assistance to the Court. His answers to the questions posed were responsive. There was an obvious cooperative attitude on his part to the judicial proceeding. López-Feliciano admitted

that the policy of DACO at the time he became Secretary in January 1985, was one of nonintervention. DACO was like a watchdog overlooking the industry. There were no price-fixing or margin-of-profit orders in effect at the time he assumed the duties of the office. DACO had a monitoring and surveillance policy using as guidelines the 8.6 cent-per-gallon and 17.7 cent-per-gallon margins as last enforced in 1981 under federal regulation. He followed the strategy of his predecessor, Secretary Héctor Ramos, using as a guideline Regulation No. 45, Amendment 1, of 1976.

Under his leadership, DACO first began to look into the profit margins in November/December 1985. The guidelines followed had no supporting studies. They were borrowed from federal regulation. Hearings were had in January 1986. At the time he left office to become Police Superintendent, that is, on March 3, 1986, there was no report on the subject discussed herein.

Contrary to the straightforward demeanor of former Secretary López-Feliciano, the testimony of the defendant Pedro Ortiz-Alvarez was defensive and biased to DACO's position. This defendant could not tackle specifics on the subject of the underlying studies and policy which motivated the first price-fixing orders in the industry since 1981, to wit: The April 23 order and the May 20, 1986 order. Ortiz-Alvarez had to admit that the May 20 order was prepared in contemplation of trial by retained trial counsel Messrs. Coleman and Robinson, and assistants Hearing Examiner Hjalmar Flax, Evelyn Otero, Carlos Lasanta, Assistant Secretary Matilde Acevedo, and himself. However, he tried to justify the soundness of the order by stating that the same was the product of a "long process" dating back to April 23, 1986. The Secre-

---

**14.** We do not decide this case based on procedural due process considerations. However, the truth of the matter is that, if we were to examine procedural considerations in light of the Administrative Procedure Act, 5 U.S.C. Sec. 500–576, or even under procedural local law, 3 L.P. R.A. Sec. 341g(a), 3 L.P.R.A. Secs. 1041–1059, and/or 3 L.P.R.A. Sec. 341e, seen in light of Sec. 341g(a), the procedures followed would leave an administrative-law expert breathless. If it had been only procedural due process violations, the whole matter could have been solved by curing the defects. This is, of course, not the case because of substantive due process and preemption considerations.

tary had no definite criteria on what would be included in acquisition costs for the purposes of the regulation or under the regulation. He went further and attempted to establish that profit margins had been frozen in Puerto Rico since 1981 by orders of former Secretary Héctor Ramos, all under Regulation No. 45. The overwhelming evidence is that no such regulation existed as confirmed by his immediate predecessor.

The Secretary assumed responsibility for the decision that generated the April 23 orders which included the antipass-through provision of the tax levied by Law No. 5. When asked why the wholesalers were the chosen ones to absorb the tax by regulation, he attempted to justify the action on his own notions of what excessive or handsome profits were. He insisted that it was predetermined that the consumer would not pay the tax. He located the tax in the excessive margin of the big companies. Ortiz-Alvarez had to admit that the solution to the problem was more evidence gathering, more public hearings, and more remedies. On the issue of cost-of-operation determinations for cost accounting in the sale of wholesaler to retailer, he had to admit that acquisition cost, the previous 16 cent-per-gallon excise tax, overhead cost, certain transportation costs, and delivery costs, had to be considered. The record shows that DACO never developed evidence on the last three items mentioned. It was obvious from his testimony that the guidelines for regulation were poor, haphazardly gathered, with the result that there was no hard evidence to sustain the reasonability of the margins set or the placement of the antipass-through provision at the wholesale level. The defendant admitted that even though there were other solutions to the problem, he preferred the chosen options. The witness had to admit that the particular case of TENOCO and COQUI was such that even though charged with excessive earnings, the evidence was to the contrary. The defendant stated that he would force the plaintiffs to operate at a loss by regulation to gain back the "excessive earnings" made in January-March 1986. He had to admit that some of the so-called big compa-

nies were losing money. In his opinion, excessive profits are determined by reference to "experience". The witness could not explain to our satisfaction if the operating expenses were to be accounted for before or after the establishment of gross margins of profit. He claimed to have retroactive price fixing/regulatory power. The witness could not tell what he expected of the order of May 20, 1986 and had to admit that the new excise tax enacted through Law No. 5 had much to do with the actual situation. When asked what accrued as a result of the January 1986 hearings, he admitted that no decision was taken for gross margins of profit. However, three decisions were taken: It was determined that the Law No. 5 tax would not reach the consumer; that the tax would be absorbed by the excessive profits of wholesalers, and that the market, deemed highly disorganized, would be the object of regulation.

We do find that the refining and wholesale gasoline markets in Puerto Rico were at all times up to April 23, 1986 highly competitive. The wholesalers were fiercely competing and the smaller wholesalers (such as CARIBE, TENOCO, and COQUI), were increasing constantly their market share. On March 26, 1986 and thereafter, DACO only had the benefit of studies of doubtful value, such as Exhibit 37, Exhibit 1, Exhibit 2, and Exhibit 6. We find, as a matter of fact, that the regulatory/price fixing orders of March 26, April 23, and May 20, were arbitrary, unreasonable, discriminatory, and confiscatory in nature.

### Specific Findings Regarding Plaintiffs TENOCO and COQUI

TENOCO and COQUI are principally engaged in the wholesale of gasoline to their clients, the vast majority of whom are retailers who operate independent, unbranded gasoline service stations. These two companies compete in the second tier of the market, that is, as wholesalers-distributors who purchase gasoline from refineries for resale and distribution to retailers. The only supplier of these companies is PHILLIPS. TENOCO began selling gasoline in

1984; COQUI commenced the sales in 1983. They are the smallest of all wholesale distributors, followed by CARIBE and GASOLINAS/ISLA. TENOCO and COQUI successfully penetrated the distribution market for gasoline at the second wholesale level through aggressive competing pricing, based on streamlined overhead, which allowed them to undersell competitors. TENOCO's share of the business grew monthly and during the month of March 1986, it sold 4.7 million gallons of gasoline, representing over 5% of the wholesale market. TENOCO and COQUI have provided, as acknowledged by the defendant in its April 29, 1986 orders, healthy competition, pursuant to specific legislative intent under 23 L.P.R.A. Secs. 1131–1135.

The April 29, 1986 orders issued by defendant recognized TENOCO and COQUI's contribution to the healthy competition in the market. It was further acknowledged that TENOCO and COQUI never had unreasonable or excessive profits in the first quarter of 1986.

TENOCO and COQUI have no control whatsoever over the final resale price charged to the consumer by the retailers, the latter being independent dealers who set their own prices and determine their own profits.

As a result of the decrease in crude price between January and April, 1986, TENOCO and COQUI, as well as other wholesalers, reduced their wholesale prices, thereby transferring to the next level, the retailers, savings resulting from the reduction in their purchase prices.[15] TENOCO and COQUI have maintained lower prices and passed on to their retailers even greater savings than their competitors. The sale price to retailers of gasoline by TENOCO decreased from $0.96 and $0.97 per gallon for unleaded and leaded gasoline, respectively, in January 1986, to $0.74 and $0.75 per gallon in April 1986. The sale price to retailers of COQUI decreased from $0.95 per gallon for both unleaded and leaded gasoline in January 1986 to $0.78 unleaded and $0.79 leaded gasoline.

The immediate effect on plaintiffs of the enactment of the Law No. 5 excise tax was to increase the purchase costs of gasoline from PHILLIPS by $0.0476 per gallon from March 31, 1986, by $0.119 per gallon in April, and by $0.1429 per gallon in May 1986. The effect of the aforesaid increases, together with the price freeze for wholesalers and the tax antipass-through provision resulting from the April 23 and April 29, 1986 orders, has been to create direct losses for TENOCO and COQUI. The cost to TENOCO and COQUI of delivering gasoline to retailers during the week from Friday, May 2, 1986 at midnight, to Friday, May 9, 1986 at midnight, was 83.25 cents per gallon for unleaded and 86.75 per gallon for leaded gasoline. TENOCO in turn sold at $0.80 and $0.81 per gallon for both unleaded and leaded gasoline. They sold 189,544 gallons of unleaded gasoline and 287,316 gallons of leaded gasoline that week and had a direct gross loss of approximately $22,680.85 during that week or about $3,240.12 per day. TENOCO's historical gross margin is 3 cents per gallon. Therefore, plaintiff has suffered a loss of gross earnings at its already reduced volume of $14,305.80 for the first week of May, or $2,043.70 per day. Beginning Sunday, May 11, 1986, the new cost to TENOCO of gasoline delivered to retailers was $0.8725 per gallon for unleaded gasoline and $0.8975 per gallon for leaded gasoline. TENOCO sold gasoline at $0.80 and $0.81 for leaded and unleaded gasoline, respectively, with a loss of $0.725 to $0.975 for every gallon of gasoline sold with additional increased losses. The cost to COQUI of delivering gasoline to retailers was $0.8675 per gallon for unleaded gasoline and $0.8925 per gallon of leaded gasoline. COQUI in turn sold at $0.78 and $0.79 per gallon of leaded and unleaded gasoline, with a loss of $0.875 and $0.1025 for every gallon of unleaded and leaded gasoline sold, which losses in total and per unit increased as time went by.

15. *See* footnote No. 9.

TENOCO and COQUI tried to minimize their loss by attempting to maintain as many of their clients as possible, even though to do so they had to sell at a loss. Being forced to be less competitive, TENOCO and COQUI have further lost clients. TENOCO's volume of business during the month of April was reduced by 891,560 gallons.

During the month of March 1986, TENOCO sold 4,725,413 gallons of gasoline which represents an average of 157,514 gallons per day. Since March, TENOCO's volume of business has decreased to the point that during the full week of May 2 to May 9, the average daily sales were 68,123 gallons, which is a loss of 89,391 gallons per day. During the month of March, COQUI sold 2,186,500 gallons, an average of 70,532 per day, and during the first two weeks in May, the average daily sales were 59,964, that is, a loss of 40,568.

TENOCO and COQUI have been purchasing all of their gasoline from PHILLIPS, which sets its gasoline prices at the levels reported in the Platt's Oilgram Price Report at the Houston and Miami prices, whichever is higher. PHILLIPS further adds the cost of the excise tax imposed by the Law No. 5 excise tax. TENOCO and COQUI have no control on the price they must pay to PHILLIPS, or on the way the formula for determining the excise tax is applied. Yet, TENOCO and COQUI must suffer the increase in price produced by the tax, inasmuch as they are in effect prevented by the orders of April 23, April 29, and May 20, 1986 from adjusting their prices in a logical, cost-related manner. In the ordinary course of business, as it occurred during the once-existing federal regulations, when the cost of gasoline purchased by TENOCO and COQUI increased, or when taxes were levied on gasoline, the resulting cost increase was normally to be added to the prices quoted to retailers.

As soon as TENOCO and COQUI received information that the second April 23, 1986 order had decreed a freeze in prices which wholesalers charged retailers as of March 31, 1986, they sought to have the order set aside. The Presidents of TENOCO and COQUI and other authorized representatives called defendant Pedro Ortiz-Alvarez and other officials at DACO, and informed them of the hardships such orders would cause TENOCO. Motions to set aside the April 23 order were promptly filed. The Motions to set aside the order of April 23, 1986, as well as the information given to defendant Secretary Pedro Ortiz-Alvarez, emphasized the negative impact of the orders of April 23, 1986. TENOCO and COQUI explained that it was imperative that all wholesalers be allowed to quote in their price the tax and any increases in the price of gasoline to their clients, since they are unable to sell at prices below their costs if they are to remain in business.

Defendants' orders of April 23 and April 29, 1986 forced TENOCO and COQUI to absorb the increase in the cost of gasoline brought about by the Law No. 5 new excise tax, as well as additional acquisition costs by reason of increases in the price of crude. Defendants' actions forced TENOCO to sell gasoline at a loss to the point that at the time of trial, its cash reserves had been reduced from approximately $1,000,000 to $300,000. TENOCO's volume of business was seriously reduced as a result of the challenged orders. After the April 23 orders which retroactively froze prices to those existing on March 31, 1986, TENOCO was forced to sell at the March 31 prices posted by other wholesalers, which prices were under TENOCO's costs. As a result of the April 23, 1986 order, TENOCO lost and is losing substantial sums of money since April 1986. Defendants had knowledge at all material times that TENOCO had been forced to sell at less than cost. The May 20, 1986 order subjects this wholesaler to an imprecise remedy that does not correlate to the gasoline market, further sinking TENOCO into a loss pattern without adequate profit.[16]

---

**16.** During the pretrial conference we inquired from the parties whether the May 20 order gave at least TENOCO the temporary relief it had requested by temporary restraining order as de-

The effect of the price fixing/regulatory orders at March 31 levels was to eliminate TENOCO's competitive position in the wholesale market which depended until March 26, 1986 on the free-market forces. TENOCO's potential loss of market share is difficult if not impossible to calculate at this time. For the period May 3 to May 9, TENOCO lost some $29,000. On May 10, 1986, the losses for that day were some $7,000. For the period May 11–12, 1986, the loss was some $11,500 in those two days. The expected loss for the remainder of the month of May was at the same rate as for the period May 11–12, 1986.

TENOCO has further experienced uncertainty on the supply of gasoline from PHILLIPS. Retailers are doubting the company's ability to further supply gasoline. Clients have been lost.

### Specific Findings Regarding SHELL/MOBIL

SHELL and Mobil dedicate themselves to the wholesale of petroleum-derived products, including gasoline, aviation fuel, and lubricants. SHELL sells its gasoline through approximately 210 service stations, while MOBIL sells through approximately 105. SHELL and MOBIL generate approximately 192 direct jobs and have a capital investment in Puerto Rico of approximately $24,000,000 and $9,000,000, respectively, for which investment they historically expected an appropriate return.

Upon the decrease in the cost of acquisition of gasoline, SHELL and MOBIL passed through this decrease to the retailers, decreasing their prices by 39 cents per gallon, by mid-March 1986.[17] SHELL and MOBIL could have decreased their prices by five additional cents per gallon, but did not do so, upon realizing that the new excise tax would be enacted. Throughout this period, SHELL and MOBIL met with

the Secretary of the Treasury, members of the Legislature, and DACO, to advise of the imminent adverse impact of such tax in light of the forthcoming increases in the cost of acquisition of gasoline.

SHELL and MOBIL set the prices of their gasoline to retailers taking into account their cost of acquisition, cost of marine transportation, operational expenses, taxes, a reasonable return of investment to their shareholders, and factors such as inherent risks of the market. Average annual investment in Puerto Rico is close to $5,000,000. SHELL has undergone losses, at times, throughout the years. When the market has so forced it, SHELL has absorbed said losses; when the market has allowed it, SHELL has obtained profits. The average profit margin for SHELL for 1985 was approximately 12.5 cents per gallon. Because of the abnormal market conditions during the first three months of 1986, SHELL had a higher profit margin during January through March of approximately 20 cents per gallon, which would have been reduced by five cents had SHELL not been forced to retain this amount to further study the impact of the new excise tax.[18] SHELL and MOBIL's profit margin for 1986, under normal conditions, was to be around 14 to 15 cents per gallon.

The 8.6 profit margin that existed under federal regulations was set and revised periodically by the Federal Department of Energy. After federal controls ceased, SHELL began revising its profit margin, as required by the increases in costs. Since at least 1983, SHELL's profit margin has never been 8.6 cents per gallon. SHELL has always provided information to DACO, as requested. DACO had full knowledge that SHELL was not operating under an 8.6 profit margin since 1983.

---

nied by the undersigned. DACO was not able to answer the question. TENOCO claimed that the remedy was totally imprecise. The order did not account for the existing 16–cent-per-gallon excise tax, cost of delivery of gasoline, and the Law No. 5 new excise tax to be factored in as cost before the 8.6–cent-per-gallon margin was determined. If at all, the May 20 order made

things worse for the larger companies by setting their profit margin at 3.6 cents per gallon. But see our finding at footnote 12 on this subject.

17. *See* footnote No. 9.

18. *See* footnote No. 9.

The impact on SHELL and MOBIL of the Secretary's April 23, 1986 order was to cause daily losses, after operating expenses and taxes, of approximately $226,000 for SHELL and $123,000 for MOBIL, commencing on the first week of May 1986.

SHELL officials met with DACO's Secretary and its personnel on several occasions, including April 8, 22, 24, and May 5 and 8, 1986. On all such meetings, the impact of the excise tax and the March 26/April 23 orders on SHELL and MOBIL, the trends of increases in costs of acquisition of the products, and the precarious situation of SHELL and MOBIL were discussed. All information necessary to evidence this was provided to DACO, pursuant to its requests, or was volunteered by SHELL and MOBIL.

The special difficulties of SHELL with regard to the excise tax, whose full impact SHELL began to feel before any of the other members of the industry, was fully discussed with DACO.[19] DACO's Secretary recognized SHELL's predicament to the point of personally interceding on behalf of SHELL with the Secretary of the Treasury to help SHELL obtain some relief, in the form of an extension of time to pay Treasury the Law No. 5 taxes on these shipments.

Throughout these meetings, DACO's Secretary recognized several times that costs of gasoline had increased significantly; he also recognized the adverse impact of the tax, and repeatedly made assurances that the market would be fully deregulated. Furthermore, the Secretary sought the industry's help in informing the Puerto Rico consumers that prices had to increase. To those effects, the industry, at its own cost, published a full-page advertisement in the newspapers, towards which payment SHELL and MOBIL contributed. The expected relief never came. To the contrary, the order of May 20, 1986, establishing a 3.6–cent gross profit margin plus a five-cent per gallon subsidy, still forces SHELL

and MOBIL to operate with daily losses of $110,000 and $59,000, respectively. If the May 20 order remains in effect, it will cause losses of approximately $2.6 Million in three months; $5.2 Million in six months, and $10.4 Million in one year.

### Specific Findings Regarding ESSO

ESSO generates 190 direct jobs and more than 1,400 indirect jobs through its retailers' chain and contractors supplying products and services, with an annual payroll and marginal benefits exceeding $7.2 Million, a book value investment in Puerto Rico in excess of $23 Million, and an average new annual investment exceeding $5 Million.

ESSO's corporate policy has always been to have constant communication with DACO and with its officers. The communications with DACO have been in relation to ESSO's retail gasoline operations, including, but not limited to, gross margins, product cost acquisition, operating expenses, sales volumes, prices, and inventories. ESSO has consistently advised DACO that its operating expenses averaged 11 cents per gallon of gasoline. This was admitted by DACO's defendant Secretary Ortiz-Alvarez at trial.

Over the last two years, ESSO has also informed DACO that its historic average gross margin for the retail motor gasoline is 14.5 cents per gallon. When ESSO informed DACO of its historic gross margin and operating expenses, DACO never objected. Consistent with DACO's process of establishing a policy concerning prices of gasoline, information pertaining to cost, operating expenses, and prices was periodically requested from wholesalers. ESSO regularly responded to DACO's request. On February 4, 1981, DACO wrote to ESSO acknowledging ESSO's prices at the dealers' level of 1.3738 per gallon of unleaded gasoline and 1.3738 per gallon of leaded gasoline. On said date, DACO indicated that it was in the process of establishing a policy concerning the desired level of prices

---

**19.** At least two or three tankers laden with imported gasoline were en route to Puerto Rico at the time of the enactment of the tax. Cost for these shipments did not account for the tax antipass-through provision.

of gasoline. On May 7, 1981, ESSO informed DACO of its position on DACO's faculty to regulate gasoline prices and stated that DACO had no authority to regulate, since the field was preempted by federal law. On May 12, 1981, ESSO provided DACO with information concerning its prices of gasoline, from which it was obvious that ESSO's gross margin was in excess of 8.6 cents per gallon. DACO never objected, questioned or prosecuted ESSO for reason of said gross margin. On June 10, 1981, ESSO informed DACO of its projections on sales of gasoline, gross, and net margin for the year 1981. The projections clearly indicated the gross margin to be in excess of 8.6 cents per gallon. DACO never objected the projected gross margin informed by ESSO. In that same letter, ESSO reaffirmed its position in the sense that it was not waiving its preemption allegation by reason of submitting information to DACO.

On September 2, 1982, ESSO notified Undersecretary Nelson Soto that at the moment of termination of federal controls in January, 1981, ESSO's gross profit margin was 10.2 cents per gallon. In addition, ESSO informed DACO that its gross profit margin in September 1982 was approximately 12 cents per gallon, barely recovering operating expenses, and that a margin of not less than 15 cents per gallon was required if and when the conditions of the market would permit it. DACO never questioned, objected, or prosecuted ESSO for reason of its then gross profit margin of 12 cents per gallon, as informed on September 2, 1982, and for its anticipated future gross margin of 15 cents per gallon.

During the year 1985 and up to March 1986, former Secretary Carlos J. López-Feliciano continued the same policy of requesting information regularly on prices, costs, and operating expenses. For fiscal year 1984–1985, ESSO's gross margin as per DACO's own calculations was 15.21 cents per gallon. Net profit before income taxes was 2.91 cents per gallon and 1.60 cents per gallon after tax. As per DACO's data, ESSO's average operating expenses were 12.3 cents per gallon. DACO never objected, questioned or prosecuted ESSO for reason of said gross margin.

As found previously, on March 18, 1986, Law No. 5 was approved by the Commonwealth of Puerto Rico, imposing an excise tax on crude oil and petroleum-derived products, purportedly to reduce the gasoline wholesalers' excessive profits in view of the falling prices of crude oil. This law has no antipass-through provision. Because of said excise tax, the cost of gasoline to ESSO increased 4.76 cents per gallon during the first ten days of April 1986; 11.90 cents per gallon from April 11 to May 10, 1986, and 14.28 cents per gallon from May 11 to the present. In addition to the new excise tax, the cost of gasoline to ESSO during the same period increased by 14 cents per gallon.

On April 23, 1986, DACO issued its two orders freezing the price of gasoline as of March 31, 1986 and allowing the refineries to fully pass through the new oil excise tax to the wholesalers, forcing the wholesalers to absorb said additional cost retroactively. On April 23, the new excise tax was 11.90 cents per gallon. The April 23, 1986 order had the direct and unequivocal effect of forcing ESSO to sell gasoline to its dealers for a price below its acquisition costs, by reason of which ESSO suffered losses of approximately $1.4 Million through May 20, 1986.

ESSO's management met on various occasions with DACO's Secretary and informed him of the negative effect of the orders of April 23, 1986. Information on ESSO's operating expenses and costs was provided to DACO during said meetings. DACO never objected or questioned ESSO's information and cost data. ESSO was promised relief in those meetings, including deregulation. On May 20, 1986, DACO issued an order repealing the second April 23 order and, among other things, fixing ESSO's gross profit margin at 3.6 cents per gallon. The May 20 order had the direct effect of forcing ESSO to sell gasoline to its dealers at a loss, inasmuch as the same does not consider ESSO's aver-

age operating expenses of 11 cents per gallon. As a consequence of DACO's order of May 20, 1986, ESSO has daily losses of approximately $33,000. The sale of gasoline to dealers constitutes 95% of ESSO's retail business in Puerto Rico. ESSO's operating expenses have increased around 40 to 50% since 1981 to the present. ESSO further proved, as SHELL also did, that gasoline wholesale markets in the United States and in Puerto Rico are not comparable in view of the many differences in rental income, marketing structure, market size, average volume per service station, and cost of operating business, among others.

ESSO's external auditors certified that ESSO's gross profit margin for the three months ended March 31, 1986 amounted to 20.05 cents per gallon, but as of May 19, 1986, the day before the issuance of DACO's May 20 order, the average gross profit margin for ESSO during 1986, as certified by ESSO's external auditors, amounted to 14.33 cents per gallon, an amount lower than its historic gross profit margin.

■ ESSO did not have excessive gross profit margin during the first quarter of 1986.[20] In any event, by May 19, 1986, the gross profit margin was under its historic amount. Therefore, the May 20, 1986 order did not correspond to the economical reality of ESSO. The May 20, 1986 order, inasmuch as it gives ESSO a gross profit margin of 3.6 cents per gallon, an amount well below ESSO's historic margins, all in view of its known average operating expenses of 11 cents per gallon, resulted confiscatory in nature. The May 20, 1986 order, inasmuch as it compels ESSO to sell gasoline with a profit margin which leaves a deficit of approximately 8.0 cents per gallon for non-recuperable operating expenses attributable to the selling of the gasoline, is arbitrary, capricious, and unreasonable, and deprives ESSO of property without due process of law.

20. *See* footnote No. 9.

The gross profit margin fixed for some wholesalers at 8.6 cents per gallon in the May 20, 1986 order was based on the erroneous view by DACO that said margin was in effect as per the pertinent federal regulation as of January, 1981. (ESSO's margin at that date was 10.2 cents per gallon). The 8.6 margin was not based in any of the requirements established in Regulation No. 45, Amendment 1, Article 4.

Price Regulation No. 45, Amendment 1, Article 4, Paragraph h, establishes, *inter alia*, reasonable profit margin at the different distribution levels as a criteria for price and maximum profit margin orders. It specifically calls for "reasonable profit margin for operation expenses." The May 20 order obviously does not consider ESSO's average operating expenses of 11 cents per gallon, inasmuch as the established gross margin in the order was 3.6 cents per gallon for ESSO. We further find once again, and based on ESSO's evidence, that the gasoline industry in Puerto Rico is highly competitive. The gasoline wholesalers are all different. Costs, operating expenses, and prices are dissimilar, causing each of them to be in a different economic position and not necessarily susceptible to identical across-the-board regulation. We are convinced that ESSO, as well as the other wholesaler plaintiffs, exhausted all available extraofficial/administrative avenues with DACO in order to convince the Department to set aside the April 23, 1986 order because of the substantial losses being suffered. DACO maintained the order, but promised deregulation in the immediate future. In view of DACO's failure to act, ESSO filed this action and opted to judicially prosecute its claims abstaining to submit itself to the administrative hearing scheduled for May 12, 1986.

### Specific Findings Regarding CARECO

On November 30, 1985, Gulf Petroleum, S.A. merged with Caribbean Gulf Refining Corporation (CARECO). On January 1, 1986, Compañía Petrolera Chevron, Inc. (CHEVRON) also merged with CARECO.

CARECO currently has a refining division and a wholesale marketing division, each of which is a separate profit center. The refining division lost $14 Million in 1985 and $11 Million in 1984. Eighty-five per cent of CARECO's marketing division's sales consists of gasoline sales to retailers. The marketing division supplies gasoline to 270 retailers, of which 190 operate GULF service stations, and the remaining 80 retailers operate CHEVRON stations. The marketing division owns 165 of the 270 service stations it supplies gasoline to. The marketing division sells approximately 9.5 million gallons of gasoline per month to its retailers.

As a result of the second order of April 23, 1986, DACO set maximum prices at which wholesalers could sell gasoline to the retailers. The maximum prices set were those in effect on March 31, 1986. In the case of the marketing division, the maximum price was set at 80 cents per gallon. At the time of trial, the cost of gasoline to the marketing division was 60 cents per gallon. Additionally, the marketing division had to pay 16 cents per gallon corresponding to a previously-enacted excise tax, plus 14.29 cents per gallon on account of the new tax imposed by Law No. 5, of March 18, 1986. Therefore, the total cost of acquisition of gasoline to the marketing division, at the time of trial, was 90.29 cents per gallon. The administrative expenses of the marketing division solely attributable to the sale of gasoline to its retailers currently amount to 7.5 cents per gallon. Since the marketing division is required to sell its gasoline to retailers at 80 cents per gallon, it is selling it at more than 17 cents below cost.

The May 20, 1986 order issued by DACO established two categories of gasoline wholesalers. Wholesalers in the first category are allowed a maximum gross profit margin of 8.6 cents per gallon, while wholesalers in the second category are allowed a maximum gross profit margin of 3.6 cents per gallon. The May 20 order placed the marketing division within the second category. The gross profit margins established by the May 20 order do not take into account the wholesaler's administrative expenses. Since the marketing division's administrative expenses are 7.5 cents per gallon, it would suffer a loss, in view of the 3.6–cent margin set by the May 20 order, of 3.9 cents per gallon of gasoline sold. Since the marketing division sells approximately 9.5 million gallons of gasoline per month, it would have monthly losses of $370,000.

The net book value—cost of acquisition less depreciation—of the marketing division's investment directly attributable to the sale of gasoline is $24 Million. The marketing division would have a negative return on investment by selling gasoline at the gross profit margin of 3.6 cents per gallon established by the May 20 order. If the gasoline was to be sold to the retailers at the gross profit margin of 8.6 cents per gallon established by the May 20 order for wholesalers in the first category, the rate of return on investment would then be 2.8% per year. The evidence received is to the effect that the rate of return on the value of the marketing division's investment during the last five years, after taxes, fluctuated between 15 and 20% per year.

During 1985, the marketing division had a gross profit margin of 11 cents per gallon and, in 1984, the profit margin was 10 cents per gallon. Rental income derived by the marketing division from the 165 service stations referred to before amounts to approximately $1 Million per year. Taking into account the aforementioned rental income, the marketing division's rate of return on investment when calculated using the gross profit margin of 3.6 cents would still be negative. If calculated using the 8.6–cent gross profit margin, the rate of return, after taxes, would only be 5% per year. The evidence established that the reasonable rate of return on a riskless investment, such as U.S. Treasury Bills, currently stands at 6.5% per year. The minimum fair rate of return on investment in an industry involving risks, such as those present in the oil industry, is 10% per year.

In issuing its April 23 and May 20 orders, DACO disregarded the information provid-

ed to it in April 1986 by several gasoline wholesalers relating to their profit margins and, instead, relied on statistical data unrelated to that provided by said wholesalers and based on unilateral assumptions. DACO did not have any information concerning CARECO's marketing division's profits for the first quarter of 1986 when it issued its April 23 and May 20 orders.

### Special Findings Regarding TEXACO

TEXACO's case was submitted for decision based on a stipulation of facts, Docket Document No. 66, and the legal argument of the plaintiff regarding federal preemption. The stipulation of fact is to the effect that as a result of the April 23, 1986 orders, TEXACO suffered losses caused by the sale of gasoline products below costs. Furthermore, as a result of the May 20, 1986 order, TEXACO, although having an allowed gross margin of profit of 3.6 cents per gallon, said margin would not permit TEXACO to recoup its overhead marketing expenses, according to information submitted by TEXACO to DACO.

### Special Findings Regarding PHILLIPS

PHILLIPS' case was submitted for decision based on a stipulation of facts, Docket Document No. 67, and the parties' legal argument regarding federal preemption. The only fact as stipulated regarding this controversy that we find pertinent is that the Law No. 5 excise tax of March 18, 1986 was allowed to be factored in as part of PHILLIPS' cost on sale of gasoline to wholesalers.

We further find from the evidence received that on March 30, 1981, PHILLIPS challenged DACO's authority to regulate petroleum-derived products and expressly reserved its right to assert said challenge. From March 30, 1981 and until the March 26, 1986 order, DACO did not attempt, directly or indirectly, to regulate or otherwise claim it had authority to regulate, the petroleum-derived products that PHILLIPS purchases or sells in Puerto Rico. From March 30, 1981 to March 25, 1986, PHILLIPS did not notify DACO nor DACO required PHILLIPS to notify, price increases. DACO has never analyzed or studied the profit margins of refineries such as PHILLIPS.

### Special Findings Regarding ISLA, GASOLINAS, and CARIBE

ISLA, GASOLINAS, and CARIBE submitted their case on the issue of preemption and entered their voluntary dismissal on all other issues.

## CONCLUSIONS OF LAW

### Abstention

Defendants have raised the issue of abstention. They request a partial application, since they submitted for resolution the issue of preemption, but state that either under the doctrine of *Burford, Younger,* or *Pullman,* this Court should decline to exercise jurisdiction as to the constitutional matters.

In *Burford v. Sun Oil Co.,* 319 U.S. 315, 325, 63 S.Ct. 1098, 1103, 87 L.Ed. 1424 (1943), the Supreme Court held that federal courts should abstain from deciding controversies where, essentially, a review over questions on the merits of state administrative policy rulings would ensue. C. Wright, A. Miller, E. Cooper, 17 *Federal Practice and Procedure* Sec. 4244 at 482–491 (1978). A *Burford*-type abstention is the most difficult of the abstention doctrines to define and to apply. *See Construction Aggregates Corp. v. Rivera de Vicenty,* 573 F.2d 86, 89 (1st Cir.1978). Generally, it requires a federal court to abstain in order to avoid needless conflict with a state's *administration* of its own affairs. As applied, however, *Burford* requires federal court's abstention when (a) the state legislation establishes a thorough system of judicial review by its state courts, and (b) plaintiff's claim is based predominantly on interpretation of state law, not on the basis of a federal right. *E.g., Alabama Public Service Com'n v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). To surrender our jurisdiction under the *Burford* guideline, the primary concern is with the "nature of the state regulatory interests in a particular subject matter and the potential

disruption engendered by federal intervention." *Construction Aggregates Corp.,* 573 F.2d at 90. In the instant case, this Court has considered the impact that the regulatory scheme has on federal constitutional rights. This case does not turn on local law. We are not reviewing DACO's policy choices. Here, the equities do not "strongly point in the direction of litigation exclusively in the state forum." *Construction Aggregates Corp.,* 573 F.2d at 93.

■ In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federalism and comity considerations counsel federal courts to abstain when federal claims "have been or could be presented in ongoing state *judicial* proceedings that concern important state interests." (Emphasis added). *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236–39, 104 S.Ct. 2321, 2327–28, 81 L.Ed.2d 186 (1984). In *Hawaii Housing Authority,* state administrative hearings had been held prior to the federal court filing in February 1979. The Court concluded that the administrative proceedings were neither part of a judicial proceeding nor quasi-judicial in nature. *Id.* 104 S.Ct. at 2328. Noting that in February 1979 "no state judicial proceedings were in process," *Id.* at 2328, the Court held:

> Since *Younger* is not a bar to a federal court action when state judicial proceedings have not themselves commenced (citations omitted), abstention for HHA's administrative proceedings was not required.

*Id.* at 2328.

Here, TENOCO initiated these proceedings by filing on May 5, 1986, a request for injunctive relief. Subsequently, the other wholesalers and refiners filed their claims, and on May 14, 1986, the cases were consolidated. On May 16, 1986, this Court consolidated the hearing for a preliminary injunction with the trial on the merits. Trial was held on May 21, 1986, at 9:00 A.M. There have been no pending state judicial proceedings either prior or subsequent to the federal court filings. In the administrative hearings held before May 1986,

DACO acted as a rule-making body in its "quasi-legislative" capacity. It is uncontroverted that the administrative proceedings were not "quasi-judicial" or adjudicatory in nature. Accordingly, *Younger* abstention is inapplicable. *See Hawaii Housing Authority,* 104 S.Ct. at 2328.

■ As to *Pullman* deferral-type of abstention, we find that the circumstances that ordain such action are not present here. Under *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), when an uncertain or ambiguous state law is challenged as contrary to the United States Constitution, federal courts should not intervene until the state courts have properly interpreted the statute. It is clear that *Pullman* abstention does not apply "... if the state law is clear on its face, or if its meaning has already been authoritatively decided by the state courts, or if the constitutional issue would not be avoided or changed no matter how the statute is construed." C. Wright, *Law of Federal Courts* at 304 (1983).

As distinguished from *Pullman,* DACO's authority under local law to issue the orders is not at issue here. This Court is not resolving this controversy based upon unresolved questions of local concern. DACO's orders are clear on their face, and no additional interpretation is necessary to analyze their constitutionality. *See Hawaii Housing Authority,* 104 S.Ct. at 2327, citing, *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971). Merely because DACO's orders are capable of being reviewed by local courts on some parallel state constitutional provision does not warrant abstention. *Hawaii Housing Authority,* 104 S.Ct. at 2327 n. 4. Abstention is, therefore, inappropriate.

### Considerations Regarding Substantive Due Process

■ The Commonwealth of Puerto Rico has the police power to regulate in the public interest those matters relating to intrastate commerce. *Comtronics, Inc. v.*

*Puerto Rico Tel. Co.,* 409 F.Supp. 800, 808–10 (D. P.R.1975), *aff'd,* 553 F.2d 701 (1st Cir.1977). Puerto Rico's exercise of its regulatory authority is not absolute. Its police power is constrained by the due process clause of either the fifth or the fourteenth amendment of the United States Constitution. *E.g., Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 668 n. 5, 94 S.Ct. 2080, 2084 n. 5, 40 L.Ed.2d 452 (1974). DACO's pricing and "profit margin" orders are obviously economic in nature and, thus, subject to the "minimum rationality" or "rational basis" test of substantive due process. That is, absent a fundamental right or a suspect classification, economic or social regulation is held constitutional when the means are rationally related to legitimate governmental objectives. *See Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981) (equal protection challenge).

In *Nebbia v. People of the State of New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed.2d 940 (1934), the Supreme Court retreated from the judicial interventionism of the *Lochner* era.[21] *Nebbia* involved a substantive due process attack to an order by the Milk Control Board fixing the retail prices of milk. In enacting the statute which expressly authorized the Milk Control Board to fix prices, the state legislature had concluded that increases in production and unfair trade practices in the distribution of milk were causing a dramatic price decrease. The result was an intolerable economic loss to the dairy industry and to the state. The Supreme Court held:

> Price control, like any other form of regulation is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is

free to adopt, and hence, an unnecessary and unwarranted interference with individual liberty.

*Id.* at 539, 54 S.Ct. at 517.

In *Nebbia,* the Supreme Court upheld the price fixing order. Several factors clearly justified a finding of reasonableness. First, the order fixing the price of milk at 10 cents per quart (distribution level) and at 9 cents per quart (retail level) established "... a differential which would be just ..." both to distributors and retailers. *Id.* at 530, 54 S.Ct. at 513. There is nothing in *Nebbia* suggesting that the price differential or the prices themselves, had a confiscatory impact. Second, the milk industry had a long history of state regulation. *Id.* at 522–23, 54 S.Ct. at 509–10. The state legislature held extensive hearings and concluded that price fixing was the optimal regulatory alternative to combat instability in milk prices. Third, the price fixing order was rationally related to the legitimate purpose of preventing competition from having deleterious market effects. *Id.* at 530, 54 S.Ct. at 513.[22]

A rational relation between an order fixing the prices of natural gas and the state's legitimate purposes of conserving energy and stimulating exploration and development of natural resources figured prominently in *Cities Service Gas Co. v. Peerless Oil & Gas Co., et al.,* 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950). Since 1913 the Oklahoma Legislature had expressly declared a policy of conserving and regulating natural gas when production exceeded market demand. In *Cities Service Gas Co.,* an Oklahoma commission statutorily authorized to set prices, found that natural gas in the Guymon-Hugoton Field was selling below its real economic value. Accord-

---

**21.** *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1904).

**22.** Among the leading cases on this matter are: *North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973) (sustaining North Dakota statute which restricted the practice of pharmacy); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (upholding state law restricting optometry); *Lincoln Feder-*

*al Labor Union, et al. v. Northwestern Iron and Metal Co.,* 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949) (sustaining state laws banning "yellow dog" contracts); *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (rejecting due process attack to federal prohibition of interstate shipment of "filled milk"); *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (upholding minimum wage legislation for women).

ingly, it fixed wellhead prices of natural gas at 7 cents per thousand cubic feet, in comparison to the market value of natural gas which stood at 3.6 to 5 cents. *Id.* at 181, 183, 71 S.Ct. at 217, 218. The Supreme Court held:

> In the proceedings before the Commission in this case, there was *ample evidence* to sustain its finding that existing low field prices were resulting in economic waste and conducive to physical waste. That is a sufficient basis for the orders issued. It is no concern of ours that other regulatory devices might be more appropriate, or that less extensive measures might suffice. Such matters are the province of the legislature and the Commission. (Emphasis added).

*Id.* at 186, 71 S.Ct. at 219. *See also Minnesota v. Clover Leaf Creamery, et al.,* 449 U.S. 456, 470 n. 2, 101 S.Ct. 715, 727 n. 2, 66 L.Ed.2d 659 (1981) (upholding state legislation prohibiting retail sale of milk in plastic, nonreturnable containers on the ground that the law served the purpose of energy conservation). More recently, in *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), the Supreme Court upheld on procedural and substantive due process grounds, a California law which restrained automobile manufacturers-franchisors from adding car dealerships to market areas of existing franchisees.[23] Even assuming anticompetitive effects from the legislation, California had the "police power ... to *subordinate* the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices." (Emphasis added). *Id.* at 107, 111, 99 S.Ct. at 411, 412. In that sense, complainants never had a right to be free from state economic regulation. *Id.* at 114, 99 S.Ct. at 414 (Blackmum, J., Powell, J., concurring). Since the

statute also afforded procedural due process safeguards, the regulatory scheme was held reasonable. *Id.* at 106–08, 99 S.Ct. at 410–11.

An analogous case is *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Responding to the petroleum shortage of 1973, Maryland enacted a law prohibiting out-of-state producers and refiners of petroleum products from operating their retail gasoline service stations within the state. Market surveys had confirmed that inequities in the distribution and pricing of gasoline by the producers and refiners were having the effect of decreasing the competitiveness of the retail market. Exxon was an out-of-state "producer or refiner" of gasoline. It also owned and operated 36 retail service stations in Maryland. Because the statute compelled Exxon to discontinue operating its 36 stations, it claimed, among others, substantive due process violations.[24] The Supreme Court disagreed with Exxon:

> [R]egardless of the ultimate economic efficacy of the statute, we have no hesitancy in concluding that [the law] bears a reasonable relation to the State's legitimate purpose in controlling the gasoline retail market, and we therefore reject appellants' due process claims.

*Id.* at 124, 98 S.Ct. at 2213.

Not surprisingly, the modern Court has adopted a "hands-off" approach to economic due process. G. Gunther, *Cases and Materials on Constitutional Law* at 450 (10th ed. 1980). According to Professor Tribe, a deferential standard of review:

> [w]ould hardly justify wholesale abdication to the political process, since there exists no type of legislation that can be guaranteed in advance to leave important constitutional principles unimpaired, and

---

**23.** In 1923, California first adopted special regulations applicable to dealers and car manufacturers. *New Motor Vehicle Bd.,* 439 U.S. at 103 n. 6, 99 S.Ct. at 408 n. 6.

**24.** Because Exxon was not prohibited from *leasing* its stations to independent dealers, *i.e.,* had

other "uses" for the "property," the state court held, 279 Md. 410, 370 A.2d 1102, 1117–18 (1977), that the divestiture provisions did not constitute an unconstitutional "taking." The Supreme Court did not reach this issue.

there is simply no way for courts to review legislation in terms of the Constitution without repeatedly making difficult substantive choices among competing values, and indeed among inevitably controverted political, social, and moral conceptions.

L. Tribe, *American Constitutional Law* at 452 (1978). Several commentators have advocated a more active judicial role over economic decisions affecting constitutionally-protected interests. An author has suggested, in economic due process cases, a stronger showing from the state that it had a basis for believing the rationality of the law. *See* G. Gunther, *Cases and Materials on Constitutional Law* at 451 n. 2. In reviewing regulatory decisions under the Administrative Procedure Act, it has been proposed that 1) the state's factual findings must have a basis in the record, and 2) the agency's ultimate policy choice must be reasonable. M. Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 507, 532–34 (1985). Another scholar has recommended that a state must adopt the less restrictive economic means available to accomplish its objectives. G. Struve, *The Less Restrictive-Alternative Principle and Economic Due Process*, 80 Harv.L. Rev. 1463 (1967).

The challenged regulatory schemes in the economic due process cases had an aura of "reasonableness". Most regulatory schemes described above, of course, have imposed direct economic costs on individual property interests. Some of the regulations have also operated as artificial market restraints. But none of these cases have involved a confiscatory "taking" of property without due process. In *National R.R. Corp. v. Atchinson, Topeka Co.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985), the Supreme Court sustained on substantive due process grounds the constitutionality of a federal reimbursement requirement. The reimbursement obligation had an impact on the complaining railroads because they had to incur substantial costs to compensate Amtrak for certain employee pass privileges. It surely would have been a different case if the reimbursement

expenditures had amounted to actual operating losses. In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), the Court warned "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." This Court concludes that the economic burdens imposed by state regulation in the "minimum rationality" cases, did *not* unduly interfere with or destroy the settled financial expectations of the parties, to wit, a reasonable rate of return on investment. *A fortiori*, more rigorous judicial scrutiny for some kinds of economic legislation is not foreclosed by these cases. When there is a clear showing that the regulatory scheme *as applied*, has confiscatory impacts, "wholesale abdication to the political process," L. Tribe, *American Constitutional Law* at 452, is constitutionally unwise. *See Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 391–92, 94 S.Ct. 2315, 2323–24, 41 L.Ed.2d 141 (1974) (rate regulation). In *Ferguson v. Skrupa*, 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963), quoting *Tyson & Brother, etc. v. Banton*, 273 U.S. 418, 445, 446, 47 S.Ct. 426, 433, 433, 71 L.Ed. 718 (1927) (Holmes J., dissenting), the Supreme Court acknowledged:

> [T]he proper course is to recognize that a state legislature [or regulatory agency] can do whatever it sees fit to do unless it is *restrained by some express prohibition in the Constitution of the United States* or by the State, and that courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that one particular court may happen to entertain. (Emphasis added).

In no uncertain terms, the fifth amendment of the United States Constitution prescribes "... nor shall private property be taken for public use, without just compensation." The "taking" clause applies to the states via the fourteenth amendment. *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239, 17 S.Ct. 581,

585, 41 L.Ed. 979 (1897). If the state regulation operates as a "taking" of a "property" interest, the state must afford "just compensation". Here, DACO does *not* seriously dispute that a private party's reasonable expectation of a return on investment is a "property" interest within the meaning of the fifth or fourteenth amendment. Our immediate concern is with the meaning of a "taking". This issue is highly factual and depends on several factors. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–07, 104 S.Ct. 2862, 2874–75, 81 L.Ed.2d 815 (1984). Those are: 1) the economic impact of the regulation, 2) the character of the state action, and 3) its interference with reasonable investment-backed expectations. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). It is settled that mere diminution in property value would not alone establish a "taking." *Id.* at 131, 98 S.Ct. at 2662. But the majority in *Penn Central* does not appear to dispute that "... the inability of the owner to make a reasonable return on his property requires compensation under the fifth amendment." *Id.* at 149, 98 S.Ct. at 2672 (Rehnquist, J., Burger, J., Stevens, J., dissenting).

This principle is well illustrated by *Mora v. Mejias*, 223 F.2d 814 (1st Cir.1955). *Mora* involved a substantive due process challenge to an order by the Secretary of Agriculture of Puerto Rico fixing the maximum wholesale prices of rice, a commodity of first necessity in Puerto Rico. Plaintiffs were rice importers-wholesalers who, after more than two years of civil litigation, had been criminally charged for violating the order. Before February 25, 1953, millers' prices in the United States charged to Puerto Rican importers were fixed by federal regulations at $12.00 per 100 lbs. for superior quality rice and at $11.60 per 100 lbs. for good quality rice. On February 25, 1953, the federal price controls were removed. Accordingly, the prices of rice in the United States increased to $13.25 and $12.45, respectively. This represented an increase in the acquisition cost of rice for Puerto Rican importers of $1.25/$0.85 per

100 lbs. since the federal controls were removed. The importers still managed, however, profit margins of $0.90/$0.65 under an unregulated market. On March 12, 1953, the Secretary issued an order fixing the wholesale prices (sale prices) at $12.90/$12.25 per 100 lbs., respectively. The Secretary had intended to bring down the prices of rice in the United States. In so doing, the cost of acquisition of rice to the importers exceeded the sales price, thus forcing losses. The First Circuit noted:

> By the order in question the Secretary deliberately set out to subsidize Puerto Rican rice consumers at the expense of the rice importers....

*Id.* at 818.

The First Circuit also found that the order, as applied, was not seasonal or temporary, and placed the entire rice importing industry in Puerto Rico in a disastrous economic position by forcing sales below cost. Thus, the First Circuit held that the order did not meet the "minimum rationality" criteria of *Nebbia*, and, therefore, was arbitrary, capricious, and unreasonable. Although the Court of Appeals did not entertain a challenge under the "taking" clause, the order could also have been invalidated on that ground. The economic impact of the order was *not* a mere diminution in property value as in *Penn Central Transp. Co.*, 438 U.S. at 131, 98 S.Ct. at 2662. Clearly, its effect was to negate a reasonable rate of return on investment. That alone constitutes a "taking" justifying "just compensation" under the due process clause. *Id.* at 149, 98 S.Ct. at 2672. Adding to its confiscatory impact, the order also interfered with the rice importers' reasonable "investment-backed expectations", *Id.* at 124, 98 S.Ct. at 2659, that accompanied an unregulated market. It is uncontroverted in *Mora* that upon the lifting of the federal price controls, the rice importers were earning profits, despite corresponding increases in the price of rice abroad. Two months after deregulation, the Secretary of Agriculture quashed plaintiffs' investment-backed expectations with the confiscatory order.

■ Turning to the facts of this case, we do not pass upon DACO's other alternatives. We do not attempt to suggest other means available to deal with the controversy. We simply hold that DACO's orders of March 26, April 23, and May 20, 1986, did not consider the equities of all sectors concerned. They were not related to a legitimate purpose of regulating gross margins of profit. The orders obeyed to a promise by the Executive branch of government to maintain the price of gasoline down irrespective of consequences. We do not have a record of hearings by DACO with conclusions directing the Agency that the regulations under attack were constitutionally-acceptable alternatives, no matter how bizarre. There is no minimum rationality to these orders and there is ample evidence to sustain their arbitrariness and politically-motivated purpose. *See Mora v. Mejias,* 223 F.2d at 816, 819. To top it all, parties did not have procedural safeguards, no aura of reasonableness so as to constitute it all an impermissible abdication or attack to traditional constitutional values. DACO did not consider the impact of its action. The orders' impact is also confiscatory in nature and amounts to a "taking" within the meaning of the fifth or fourteenth amendment. The scene is set to force the plaintiffs to operate losing money until the defendant evaluates the matter later this year, possibly in August or September. (Testimony of defendant Secretary Pedro Ortiz-Alvarez). Obviously, the subsidy and margins created by the May 20 order are by no stretch of the imagination "just compensation." Even accounting for the subsidy, at least, the majority of the wholesalers are operating under cost. These plaintiffs clearly had reasonable investment-backed expectations in a *de facto* deregulated market with no history of a long process of actual regulation by DACO. This is not a case where plaintiffs simply face a mere diminution in property value. *Cf. Penn Central Transp. Co.,* 438 U.S. at 131, 98 S.Ct. at 2662. Considering how the regulations read and how they are applied, the balance weighs heavily in favor of substantive due process violations of a confiscatory character. We so hold.

## Federal Preemption of the Field Absent Emergency or Disruptive Local Market

It is argued that DACO's Regulation No. 45, as amended, and the subsequent temporary orders issued, are preempted by the federal decision to have an unregulated field of petroleum marketing. Plaintiffs' argument is that the Congressional intent is to allow the forces of the market to work without artificial controls. On the other hand, defendants classify the gasoline price control orders they have issued as not preempted, since preemption would have occurred only and if, the Congressional enactment of the Standby Petroleum Allocation Act of 1982 had been signed into law by the President.

We are confronted with a situation where a local, state-law regulation is allegedly preempted by a federal policy that relies on free enterprise, economical notions of supply and demand as the most efficient mechanism to protect the interests of all of those affected by it. There is no doubt that this is the federal policy since the federal government has concluded that "government intervention in the market does not work, primarily because it cannot deal adequately with all the various factors in a system as complex as the Nation's energy system." The National Energy Policy Plan, 49 Fed. Reg. 30,646, 30,647 (1984).

The controversy requires us to examine the whole trajectory of Congressional, federal interest in the area of supply and demand of crude oil-derived products so as to determine whether Congress, the President, and the executive agency concerned have assumed the burden of deregulating the industry as an affirmative action versus whether we are confronted with a federal inertia which just let the matter vanish from the ambit of federalism into the arms of local, individualized, state interests. *United States v. Smith,* 726 F.2d 852, 859 (1st Cir.1984).

■ The doctrine of preemption is a judicially-defined concept which is derived

from article III of the United States Constitution, *see Fidelity Federal Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (preemption may be express or implied). Under this normative frame, the courts have delineated diverse criteria, so to say, under which a state law will be declared invalid if it is either (a) prohibited by the literal and express terms of the Congressional law, *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, ——, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); (b) the Congress has regulated the field in such a vast and comprehensive way so as to preclude any other state interference, *Fidelity Federal Savings & Loan Ass'n*, 458 U.S. at 153, 102 S.Ct. at 3022; *Warren Trading Post Co. v. Arizona State Tax Com'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (comprehensive federal regulation—preemption is presumed); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236–37, 67 S.Ct. 1146, 1155–56, 91 L.Ed. 1447 (1947); (c) preemption will be applied because a conflict is found between the compliance with a federal law versus a state law, *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963); or (d) the last type or category of preemption occurs, that is, when a federal decision exists as to affirmatively elect deregulating or a hands-off approach as to best achieve the federal objectives. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1970). Under all these categories, the court's duty is to strike harmony between the federal and the state interests, *County of Suffolk v. Long Island Lighting Co.*, 554 F.Supp. 399, 403 (E.D.N.Y.1983), *aff'd*, 728 F.2d 52 (2nd Cir.1984), with the understanding that whenever the "challenged state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the same will be declared preempted. *Maryland v. Louisiana*, 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Pac. Gas & Elect. v. State Energy Resources Conserv.*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Pérez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Tousley v. North America Van Lines, Inc.*, 752 F.2d 96, 100 (4th Cir.1985); *U.S. v. City of Pittsburg*, 661 F.2d 783, 785 (9th Cir.1981); *Finberg v. Sullivan*, 634 F.2d 50, 63 (3rd Cir.1980); *L & L Started Pullets, Inc. v. Gourdine*, 592 F.Supp. 367, 371 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 1 (2nd Cir.1985).

Here, we specifically have to determine whether the federal decision to forego regulation of price controls of petroleum products implies authoritatively a federal determination that the area is best left unregulated. If such is the finding, "in that event [federal action] would have as much preemptive force as decision to regulate." *E.g., Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, —— U.S. ——, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986); *Arkansas Elec. Co-op Corp. v. Arkansas Public Com'n*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983); *see also Ray v. Atlantic Richfield*, 435 U.S. at 174, 98 S.Ct. at 1002; *City of New York Dept. of Consumer Affairs v. Coney Island Service Station*, 113 Misc.2d 1012, 450 N.Y.S.2d 661, 662 (Sup.Ct.1982) (decision to remove federal regulations cannot be interpreted as an invitation to the states to impose additional regulations).

The conflict is to be assessed by examining the nature of the activity which the state has attempted to regulate, rather than the method used. *Chicago & N.W. Transp. v. Kalo Brick & Tile*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

■ DACO intends to regulate the margins of profit and prices/costs at all levels of distribution of the gasoline market.[25]

---

**25.** Under a preemption doctrine analysis, local regulations or ordinances have the same standing as state statutes. They all comprise the term "state laws". *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976);

As the matter now stands, it imposes a gross profit margin ceiling of 8.6 cents for wholesalers and 17.7 cents for retailers per gallon of gasoline, with no reference to particular guidelines. This is the nature of the state-regulated activity—prices. This now requires that we move toward the federal activity in this area, and examine the legislative history and the Congressional mandate. To find the "clear intent" of Congress, we need to examine the language and legislative history of the acts. The intent is best determined by an analysis of the language of the statute in question. *E.E.O.C. v. Hernando Bank, Inc.*, 724 F.2d 1188, 1190 (5th Cir.1984).

### Federal Intervention in the Market: Origins

■ As all the parties to this suit have stated in their memoranda, the federal intervention in the market of petroleum-derived products was triggered by a worldwide crisis on the supply of the crude oil that moved the nation to recognize that the energy problem was one of national concern. When price controls became effective on May 15, 1973, the oil industry was charging a wide range of prices for its products. *Reynolds Industries, Inc. v. Mobil Oil Corp.*, 741 F.2d 1385, 1386 (Temp. Emer. Ct.App.1984). But the concern of the federal government can be tracked to 1959, when President Eisenhower, advised of the growing dependency of the nation on the imports of crude oil and the principal crude oil derivatives and their derivatives, enacted under Section 232(b) of the Trade Expansion Act of 1962, 19 U.S.C. Sec. 1862(b), a Mandatory Oil Import Program (MOIP). *See* Proclamation No. 3279,

24 Fed.Reg. 1781 (1959), *reprinted in* 1959 U.S. Code Cong. & Ad. News 948. MOIP was intended to reduce the gap between domestic supply and demand, encouraging development of domestic production. This program was amended in 1973 by President Nixon, Proclamation No. 4210, 3 C.F.R. 31 (1974), *reprinted in* 1973 U.S. Code Cong. & Ad. News 3407. These were steps taken by the Executive branch to curtail dependency on foreign imported oil. These steps were not fruitful since the domestic demand of crude kept increasing. During the 1973–74 Organization of Arab Petroleum Exporting Countries' (OAPEC) oil embargo, the U.S. energy market of energy suffered disruptive effects. During the 1970's, the nation suffered major energy crisis.[26] The first steps of the federal government to deal in this field were initiated by the Executive branch. It was necessary to act due to the crisis and emergency which had been caused. Thereafter, it was realized that controls more than mere quotas were required. These were delineated into allocating crude oil and control of prices. The first attempts in this area were taken by President Nixon under his Economic Stabilization Program [27] creating the Cost of Living Council (CLC), under which the President imposed a comprehensive price freeze on sales prices of all products, 12 U.S.C. Sec. 1901 et seq. (Supp. 1976), 38 Fed.Reg. 1,473, 22,536 (1973); Exec. Order No. 11,695, 38 Fed.Reg. 1473 (1973).[28] This was necessary to curb the clear inflationary trend versus a decline in domestic crude oil production, 38 Fed.Reg. 6283 (1973).

At this historical stage, Congress enacted the Emergency Petroleum Allocation

---

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

**26.** The natural gas shortage in the winter of 1976–1977, the coal strike in the winter of 1977–1978, the Iranian revolution in 1979, and the Iran-Iraq war in the fall of 1980, caused another major oil supply disruption. All of those experiences have convinced Congress of the need for prior preparation and planning to provide a quick and predictable response to any particular emergencies facing the United States.

**27.** Created by the authorization of the Economic Stabilization Act of 1970, 12 U.S.C. Sec. 1904 note (Supp.1976), expired on April 30, 1974, pursuant to section 218 of that Act.

**28.** These were subsequently superseded, as is the history with all the subsequent regulations in this field, when under the Emergency Petroleum Allocation Act, *see supra*, at 480, the jurisdiction of the matter was given to the Federal Energy Administration, 39 Fed.Reg. 1924 (1974).

Act, in response to the national energy crisis created by the Arab oil embargo of 1973 and the ensuing petroleum products' shortages. 15 U.S.C. Secs. 751–756 (1973). Under this legislation, it was fully recognized that to deal effectively with the energy crisis, the authority to do so rested on the Executive branch. There it was stated:

(a) The Congress hereby determines that—

. . . . .

(3) such hardships and dislocations jeopardize the normal flow of commerce and constitute a national energy crisis which is a threat to the public health, safety, and welfare *and can be averted or minimized most efficiently and effectively through prompt action by the Executive branch of Government.* (Emphasis added).

15 U.S.C. Sec. 751 (1973).

Therefore, Congress expressly granted to the President of the United States a *"specific temporary authority* to deal with the shortages of crude oil, residual oil, and refined petroleum products or dislocations in their national distribution system." (Emphasis added). 15 U.S.C. Sec. 751(b) (1973).

The United States was experiencing a crisis of energy supplies at all levels. Since no provisions were taken to ameliorate the effects of a shortage of supply, the states' individual acts in this area were not effective. In this frame, Congress had to expressly provide that the acts to be taken by the Executive branch would preempt conflicting state law. 15 U.S.C. Sec. 753. EPAA was due to expire in 1975, but its life was extended pursuant to 15 U.S.C. Sec. 760(a) (1975). This law amended certain provisions of the EPAA and also enacted a new legislation known as the Energy Policy and Conservation Act. 42 U.S.C. Sec. 6201 et seq. This was a product of the Congressional concern and knowledge that the Nation had "entered into a new era in which energy resources previously abundant [would] remain in

short supply, retarding [the Nation's] economic growth and necessitating an alteration in [the Nation's] life habits and expectations" and, thus, *"the need for policy decisions at the national level."* H.Rep. 94–340, *reprinted in* 1975 U.S.Code Cong. & Adm.News 1762, 1763. (Emphasis added).

The EPCA also amended 15 U.S.C. Sec. 757 (1975) of the EPAA to expressly authorize the President to exempt, in his discretion, any refined petroleum product from the price and allocation regulations promulgated under EPAA. In so doing, Congress intended *to facilitate a "smooth transition of petroleum markets from a closely regulated state to a largely unregulated status subject only to standby pricing and allocation authority."* *Id., reprinted in* 1975 U.S.Code Cong. & Ad.News at 1818. (Emphasis added).

The decision as to when to deregulate the market was clearly vested in the Executive branch of the government.

The goal of Congress was a gradual and studied decision so as to return to an unregulated market. The transition to an unregulated market was dependent on the normalization of the market conditions. On August 17, 1979, the Carter administration exempted from the federal price controls the "first sale of heavy crude oil." 44 Fed.Reg. 44,949 (1976). He also directed the Department of Energy to study what other types of heavy crude oil should be exempted from price controls "pursuant to the Emergency Petroleum Allocation Act of 1973." Exec. Order No. 12, 44 Fed.Reg. 48,949 (1979).

The Executive branch kept its Congressionally-delegated role as to observe the forces of the market and to implement liberation from the regulations. On January 28, 1981, President Reagan pronounced that "all crude oil and refined petroleum products are exempted from the price and allocation controls adopted pursuant to the Emergency Petroleum Allocation Act of 1973, as amended." 46 Fed.Reg. 9,909

(1981).[29] EPAA expired on September 30, 1981. 15 U.S.C. Sec. 760g (1975).

Under the above-referred federal actions in the petroleum market, it is unequivocal that Congress intended to deposit broad authority in the Executive branch to regulate the same. The cardinal principle behind the vested authority was that they should move their actions to achieve a deregulated market in the future. This is reflected in the President's broad statutory authority to change the regulations.

When the first executive order by President Carter was issued, and categories of controlled and uncontrolled petroleum products emerged, various states attempted to acquire regulatory jurisdiction over the exempted products. Two cases are illustrative on this. The first is *Mobil Oil Corp. v. Dubno*, 492 F.Supp. 1004 (D.Conn.1980), *dismissed in part and aff'd in part*, 639 F.2d 919 (2nd Cir.), *cert. denied*, 452 U.S. 967, 101 S.Ct. 3122, 69 L.Ed.2d 980 (1981).[30] Here was in question a state law which indirectly was regulating the price of gasoline. Even though the state legislation only applied to those petroleum products which had already been exempted from the EPAA, after an exhaustive analysis of the federal regulatory scheme in effect at that time, and of the preemption doctrine, the court concluded that "[s]ection 13(b) of Connecticut Public Act 80–17 is unconstitutional in that it is preempted by federal law and thus violates the Supremacy Clause." *Dubno*, 492 F.Supp. at 1015. There, the court emphasized Congress' intention "that price controls represent a temporary departure from the free market norm and that they be implemented so as to disrupt the free market as little as possible." *Dubno*, 492 F.Supp. at 1011. On appeal, the Second Circuit refused to pass upon the claim

of preemption stating that the Temporary Emergency Court of Appeals (TECA) had exclusive jurisdiction over the issue. In said case, TECA entered no opinion. However, in an identical controversy involving a New York statute, TECA upheld the declaration of preemption of state price-fixing intervention over the products that had been federally declared exempted. *Mobil Oil Corp. v. Tully*, 499 F.Supp. 888 (N.D. N.Y.1980), *aff'd*, 653 F.2d 497 (Temp.Emer. Ct.App.1981), *vacated and remanded on other grounds*, 455 U.S. 245, 102 S.Ct. 1047, 71 L.Ed.2d 120 (1982).[31]

Under these holdings, the effect of deregulating the prices could only mean that the Executive branch had done a good job and accomplished the goal of a free market. States are not authorized to be an obstacle to the free market; in this sense, they are preempted from acting.

Defendants intend to depart from this type of analysis by arguing that the Congressional enactment of the Standby Petroleum Allocation Act (SPAA) S. 1503 (1982), provided for the preemption of state regulations, especially those which fixed prices. This, they argue, is evidence that said power is not preempted absent Congressional legislation. We do not agree. The SPAA was an intent to provide a supplemental source of authority, *to the Executive*, in "the event of a severe petroleum supply shortage." *See* Section 272 of Senate Bill (S. 1503) as amended up to February 22, 1982. The Congressional stand on this matter is restated in the Joint Explanatory Statement of the Committee of Conference, 128 Cong. Rec. H410 (1982).

In general, it is the intent of the conferees that the decision as to when and to what extent to replace market mecha-

---

**29.** At said time, it is said that practically all controls had already ended, except those on crude oil. *See* J.M. Sellers, *Decontrol and Regulatory Legitimacy: The Case of the Entitlements Program*, 37 Adm.L.Rev. 281, 287 (1985).

**30.** In *Dubno*, a Connecticut antipass-through tax regulation directed to gasoline wholesalers was declared unconstitutional based on federal preemption.

**31.** The issue was very similar to the one we deal with now, as to what preemptive effect had the Executive branch's affirmative steps to deregulate the field. The issue was not decided since the case was remanded to the district court. There the case was closed by stipulation. One of the stipulated conditions was that New York would repeal its tax antipass-through statute.

nisms with mandatory price and allocation program in the petroleum industry is a Federal decision, and State laws that would usurp this Federal role are hereby preempted.

*Id.* at H415.

Congress' concern was to provide the President/Executive branch with "clear authority to impose allocation and price controls" since they understood that such did not exist after EPAA expired. Conf.Rep. S1503, 97th Cong., 1st Sess. (1982), *reprinted in* 128 Cong.Rec. S1351 (1982). The Congressional preoccupation dealt with:

> [S]tate and local government might feel compelled to act unilaterally to deal with a shortage.
>
> The possibility for such uncoordinated actions already exists. Unless the Federal Government asserts control, the multiplicity of often conflicting State and local laws already on the books could disrupt commerce and exacerbate the impact of a shortage on the Nation as a whole.

*Id.* at S1352.

Our research has revealed that no state has enacted price controls, laws or regulations. The existing regulation is that states have enacted legislation providing, *inter alia,* for broad oil control authority, including allocation, rationing, and conservation authority *during an energy emergency.* Moreover, a substantial number of states have developed draft contingency plans which provide the actual mechanisms for controlling oil under such circumstances. Any energy emergency of sufficient magnitude to trigger a Presidential finding that a severe energy supply interruption exists, would allow action at the state level to bring state oil control authorities and conservation plans into play. Thus, the flow of crude oil and refined petroleum products domestically could be affected by individual state controls. However, it is impossible to predict in advance of an energy emergency, how substantial the impact of such state controls will be.

A detailed study of this matter was undertaken by E. O'Donnell and L. Glassman, *Energy Emergencies: Constitutional Constraints on State Efforts to Control Oil Supplies and Prices,* 5 Energy L.J. 77, 78 (1984). There, it is stated that up to 1982, states enacted statutes providing energy emergency preparedness powers. While the statutes vary considerably in scope and applicability, they usually confer broad authority on the state governors to take extraordinary actions *in response to a declared emergency.* A majority of the statutes (30) permit state governors to take any action they deem necessary to respond to the emergency. Under these statutes, governors are authorized to establish oil allocation programs (including priorities), impose rationing mechanisms, implement price controls, regulate oil consumption, and mandate conservation measures. Under these existing state enactments, the Executive branch of the state is provided power/authority to: (a) establish fuel set-aside programs (17 states); (b) establish curtailment priorities (18 states); and (c) authority to establish statewide motor fuel rationing plans (2 states). Eleven states have statutes which are typically worded to require the "fair and equitable allocation of energy resources in a manner designed to avoid undue hardship." Some statutes require equitable distribution of energy supplies among geographic areas.

Most of the statutes are not directed solely to crude oil and petroleum products. Rather, they cover all energy resources. In addition, the statutes are not limited to authorizing allocation and price controls; they generally authorize state governors to approach an energy emergency from many different angles. Thus, for example, a governor may have authority not only to promulgate allocation and price regulations, but also to impose direct demand restraint measures, establish energy conservation programs, and suspend pollution control standards. *See* Energy Emergency Preparedness Availability of Reports, 48 Fed.Reg. 2,996 (1983).

It is a known fact that the SPAA was vetoed by President Reagan. In his veto

message, the President clearly stated the motives of said action, to wit:

This legislation grew from an assumption, which has been demonstrated to be invalid, that giving the Federal Government the power to allocate and set prices will result in an equitable and orderly response to supply interruption. We can all still recall that sincere efforts to allow bureaucratic allocation of fuel supplies actually harm our citizens and economy, adding to inequity and turmoil. ... *What I do not have, do not want, and do not need, is general power to reimpose on all Americans another web of price controls and mandatory allocations.*

... Proper preparation beforehand, *and free trade among our citizens afterwards can mitigate these costs, but no magic federal plan can simply make them go away ....* (Emphasis added). Veto Message on S. 1503–Message from the President Received During the Recess, *reprinted in,* 128 Cong.Rec. S2513, S2514 (1982).

Afterwards, the Senate met to decide whether to override the President's veto. After not satisfying the two-thirds' requirement to override, the veto was upheld. One of the reasons brought forward to sustain the veto clearly was not to interfere with the free market forces. *See* 128 Cong.Rec. S2722, S2732 (1982). There it is stated:

*Let us give the free market a chance:*

Nearly everyone who testified before the Energy Committee emphasized their preference for a greater reliance on free market forces in the event of a future oil supply disruption.

Indeed, there was a fundamental agreement among all parties that the free market can invariably allocate resources more efficiently than any federal bureaucracy.

President Reagan is fully committed to this free market policy, and I would remind my colleagues that it is this policy that has resulted in the present ample supplies and declining prices of petroleum products since the decontrol of oil one year ago. (Emphasis added).

Congress was still interested in providing a fountain of authority for the President. Therefore, a bicameral compromise and a negotiation between the Executive and Congress ensued. This culminated with the enactment of the Energy Emergency Preparedness Act, 42 U.S.C. Sec. 6281 (1982). This Act was to form part of EPAA.

The Energy and Natural Resources Committee once again restates its "serious concern about the energy emergency preparedness of the U.S." S.Rep. No. 393, 97th Cong. 1st Sess., *reprinted in* 1982 U.S. Code Cong. & Ad.News 600, 601. In the legislative history of EPAA, *reprinted in,* 1982 U.S.Code Cong. & Ad.News 618–19, the Congress recognized that under energy emergency situations there is no federal preemption provision of those state and local laws that could seriously inhibit operation of market allocation and pricing, "and that could interfere with federal energy emergency responses in the event of an energy shortage." Furthermore, it is the policy of the Department of Energy of the United States (DOE) to encourage state contingency plans. Congress stated that:

Since DOE did not provide any analysis in support of this statement, the Committee intends that the report required by subsection (b) will provide a more thorough discussion of the basis for DOE's confidence in the willingness of individual States to refrain from exercising emergency powers, and from enacting and implementing petroleum product allocation and pricing laws.

When asked what the Department of Energy was doing to avoid a web of potentially conflicting State regulation, the Department responded that:

Since we want to help States develop consistent approaches, another part of our strategy is to coordinate with States through providing reliable and timely public information.

Because the Administration also believes in Federalism, we do not intend to intrude in State decisions concerning State and local problems. If, however, State actions impede interstate commerce, the Department will work with the Department of Justice to prevent or remove such restrictions.

1982 U.S.Code & Ad.News at 619.

The Energy Emergency Preparedness Act clearly states that the Federal Government intervention will be exercised as to be prepared to deal with any shortage of petroleum. This authority will be used only "as a supplement to reliance on free market pricing and allocation of available petroleum products supplies," 42 U.S.C. Sec. 6281(a). Under this Congressional policy statement, the individual states were allowed to enact their own programs in preparation for petroleum supply interruptions. 42 U.S.C. Sec. 6282(c)(2). This is the concern for need of affirmative preemptive legislation. *See* J. Vlcek, A. Gandara, S. Lewis, V. Boyette, B. Jones, C. Walker, E. O'Donnell, and L. Glassman, *Perspectives on the Appropriate Role for the Federal and State Governments during Petroleum Supply Interruptions*, 16 Nat.Resources Law.J. 613, 627–632 (1984).

EEPA was signed into law on August 3, 1982. The President made a public statement to establish his reliance on free market forces:

Very shortly after taking office, I totally removed remaining regulations on the price, production, and distribution of crude oil and petroleum products. I did this in the sure confidence that the American people, acting through the market system, would move toward optimal means of production and consumption, and I have not been disappointed.

18 Weekly Comp.Pres.Doc. 999 (Aug. 3, 1982). On July 2, 1985, EPCA was extended for four years since its Title I and II are "a basic component of the Nation's preparation for an oil supply disruption." H.R. Rep. No. 152, 99th Cong., 1st Sess. (1985), *reprinted in* 1985 U.S.Code Cong. & Ad. News 86.

In this context, defendant alleges absence of a Congress intent to occupy the field, as further evidenced by the hearing before the Committee on Energy and Natural Resources of the Senate, held on March 7, 1983 (*Oversight Implementation Hearing* ).[32] There, the Secretary of the Department of Energy, Donald Paul Hodel, in response to the reiterated Congressional concern as to whether giving express preemption authority to impede fifty piecemeal emergency programs, stated that "DOE is actively working with state and local authorities to encourage *market-oriented energy emergency preparedness planning.*"[33] (Emphasis added). *See Oversight Implementation Hearing* at 30. There it was recognized that preemption existed and that, ultimately, recurrence to the courts would ensue as to define its scope. *Id.* at 80–90. There, the Chairman of the Committee stated: "Did anybody notice that the Congress, in the last act that was passed (EPAA), said *rely upon the marketplace to the extent possible. Id.* at 88. *See also Oversight Implementation Hearing* at 294–298, 399–413.

We conclude that since 1973, Congress had delegated to the federal Executive branch the power to control the various problems dealing with oil and its products. This was in recognition that the Executive, through its expert administrative departments and more flexible mechanisms, could deal more efficiently to promote a balanced and mixed energy resource system. The decision was taken with a basic Congressional directive instruction: the regulations should be temporary. *See* 15 U.S.C. Sec. 751(b). The market should return to the

---

**32.** The full name given to this hearing was *Oversight of Implementation of the Energy Emergency Preparedness Act of 1983 (Public Law 97–229), with Particular Emphasis on Comprehensive Emergency Response Procedures.* 98th Cong., 1st Sess. (1983).

**33.** In this hearing transcript, what is clearly and unequivocally established is Congressional concern with diverse emergency programs. The Executive deponents tried to calm this concern by stating that the President is fully backed up with authority to deal with the situation.

basic free-enterprise notions of competition, supply and demand forces controlling. The federal concern in this area did not cease to exist with the expiration of EPAA, the federal concern was further achieved. The market was returned to the normal hands-off governmental approach. This federal concern is still existent as to "allow market forces to determine oil prices." *See* "The National Energy Policy Plan", Memo of the Department of Energy, 49 Fed.Reg. 30646, 30651 (1984). Congress intended, as it stated, to effect a "gradual return to an unregulated market," S.Conf.Rep. No. 516, 94th Cong., 1st Sess. 203, *reprinted in* 1975 U.S.Code & Ad.News 1956, 2045, not one regulated by the states. This is how it was before 1973, and this is how it is meant to be in a capitalist democratic society.[34]

At this moment, the Congressional laws that are operative in this field, EPCA and EEPA, are product of history lessons that have marked our society. Our Nation has confronted its dependency on imports of oil with a strategic preparation for eventual disruptions on supply.

Under the previous acts, to wit: EPAA,[35] EPCA[36], and EEPA, Puerto Rico was an actively-regulated party. Caselaw exists on the enforcement of said laws and the regulations issued thereunder in Puerto Rico. *See Bonnaffons v. United States Dept. of Energy*, 646 F.2d 548 (Temp.Emer. Ct.App.1981); *Longview Refining Co. v. W.R. Shore*, 554 F.2d 1006, 1020 (Temp. Emer.Ct.App.1977), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). The most recently-expressed legislative intent in gasoline control in Puerto Rico is that we also join the trend of a free market operation at this level. *See* 23 L.P.R.A. Secs. 1101–1135.[37]

The conduct that would be preempted is governmental interference with the pricing system absent an emergency situation. DACO's enabling act remains intact. The same applies to the gasoline control laws enacted at 23 L.P.R.A. Secs. 1101–1110. Furthermore, DACO's enabling act, 3 L.P. R.A. Sec. 341e, specifically recognizes that the general broadly-given power to regulate and control prices is to be exercised: (a) when so is justified to protect the consumer from unjustified price increments, (b) to impede the deterioration of the acquisitive power of the consumer, and (c) to protect the economy from the inflationary pressures. What is invalidated as it refers to energy supplies would be the intent to control prices, except in cases of emergency as defined by federal law.

Thus, there are many types of petroleum-related state laws that would not be preempted provided that such laws satisfy the criteria in the above discussion so as to escape preemption. Such laws can be grouped in three categories: (1) those providing the Governor with emergency powers to respond to natural and physical disasters affecting public health and safety; (2) laws that promote energy conservation, or restrain demand for petroleum products at the retail level, but would not significantly impede the operation of the federal allocation program; and (3) laws designed to accomplish regulatory goals unrelated to emergency preparedness, including consumer education and fair trade supervision.

The first category would include those state laws providing for emergency allocation of petroleum products to alleviate a shortage within the state caused by damage to or destruction of facilities located within the United States and resulting from sabotage, accidents, or an act of God.

Examples of laws in the second category are those that promote the conservation of

---

**34.** Public debate on these issues has permeated our daily press. Two editorials by The San Juan Star, editions of May 13, 1986 and May 21, 1986, express the predominant public concern. These are made a part hereof as Appendices I and II to this opinion.

**35.** 15 U.S.C. Sec. 752(7).

**36.** 42 U.S.C. Sec. 6202(4).

**37.** At 23 L.P.R.A. Sec. 1132(b), Puerto Rico's Legislature fully recognized this cardinal economic principle by stating that in the gasoline industry there should prevail commercial practices that promote the free competition.

petroleum products, such as laws creating state conservation programs pursuant to the Energy Emergency Conservation Act of 1979, provided such programs do not include allocation and price controls. Also included are state laws that restrain retail demand for petroleum products, such as odd-even management programs, minimum purchase requirements, carless day and parking restrictions, fuel switching requirements, car pooling programs, and speed limits. Also, the states' antitrust and taxing laws are not to be affected.

We conclude that Regulation No. 45, Amendment 1, Article 4, and the temporary orders of March 26, April 23, and May 20, 1986, are preempted by the federal Congressional delegated purpose to let the market forces be the sovereign in this field.

## JUDGMENT

Based on the foregoing findings of fact and conclusions of law, we hereby determine that the price/regulatory orders of March 26, April 23, and May 20, 1986, are unconstitutional based on the substantive due process and preemption considerations discussed herein. DACO's enabling act, 3 L.P.R.A. Secs. 341–341v, as well as Law No. 228, of May 12, 1942, as amended, 23 L.P.R.A. Secs. 731–746, remain intact. The same applies to Law No. 73, of June 23, 1978, as amended, 23 L.P.R.A. Secs. 1131–1135, which is Puerto Rico's latest expressions of legislative intent in the regulation and control of the gasoline industry. The defendants are enjoined prospectively from further implementing or enforcing orders fixing prices or margins of profit in the gasoline wholesale and retail business other than in accord with federal law as described in this opinion and order. The mentioned local laws can be implemented to their fullest extent, as long as the implementation is consistent with our findings and conclusions. This opinion and order containing findings of fact, conclusions of law, and judgment, shall be binding on the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

IT IS SO ORDERED.

## APPENDIX I

*THE SAN JUAN STAR—Tuesday, May 13, 1986*

**EDITORIALS**

# The 'magic' tax

The Hernández Colón administration may have come up with the perfect tax. It's called an *arbitrio reductor* which translates roughly into "reducing excise tax."

The virtue of this *arbitrio reductor* is that once imposed on a product it can make the retail price of that product go down rather than up. It's a bit like one of those fad diets that allows you to eat anything you want and still lose weight.

Thus, Consumer Affairs Secretary Pedro Ortíz Alvarez noted in a statement issued Monday that the price of gasoline at the pump actually declined by two cents a gallon since the excise tax on gasoline went into effect. Ortíz added that DACO remains firm in its stand that the new excise tax will not result in price increases to the consumer.

All of this talk about an *arbitrio reductor* is nonsense, of course. Indeed, the DACO secretary is insulting the intelligence of the Puerto Rican people by trying to pretend that the gasoline excise tax helped bring the price of gasoline down.

The excise tax on gasoline is a cost factor and somebody has to pay it. What's happened is that the administration, through its price regulations, is making the gasoline wholesalers absorb the cost of the excise tax and not letting them pass it along to the consumers.

The administration's price control gambit might win it some votes, but it could have some very negative repercussions over the long run.

First of all, while the heavyweights among the wholesalers may by able to absorb the tax for some time, the same doesn't hold true for the smaller wholesalers with more limited resources. And yet it's these small wholesalers who help hold prices down in the marketplace by underselling the larger distributors. Driving them out of business doesn't make sense from an economic point of view.

Secondly, the administration's stand on this issue is inconsistent with the pro-business image it has otherwise projected and this could hurt its industrial promotion efforts. Here's an administration which has fought to preserve and expand Section 936 and has enacted all kinds of new tax incentives for business. Now, in an about face, the administration insists its ready to go to court to defend its right to regulate prices in the gasoline industry. And all because it's trying to maintain the myth that its *arbitrio reductor* will not affect prices.

The Hernández Colón administration should stop this silly game before it creates total havoc in the island's gasoline industry. Let's lift the freeze on gasoline prices and let the forces of the marketplace do their job.

**APPENDIX II**

THE SAN JUAN STAR—Wednesday, May 21, 1986

EDITORIALS

# A befuddlement

To call the government's latest move in the gasoline price saga a puzzlement would be an understatement. Perhaps befuddlement would be a more apt description.

In a new order issued Tuesday, the Consumer Affairs Department offered some relief to the island's gasoline wholesalers through a complex system of credits or subsidies, ranging from 5 to 10 cents per gallon. The "bad guys" who allegedly overcharged

consumers when gasoline prices were dropping will get the smaller subsidy.

The bottom line is that the government will be able to keep retail gasoline prices at their present levels without driving the companies that produce and sell gasoline out of business.

It all began with an oil excise tax that became law earlier this year. At the time, the price of crude oil was dropping rapidly but not so the price of gasoline to consumers which was dropping much more slowly. So the administration, in effect, told the gasoline wholesalers that they would have to absorb the cost of the new tax because their failure to pass along savings to consumers had brought them excess profits.

Naturally, the gasoline wholesalers protested. Their protests became a lot louder as the price of crude oil—and gasoline—began to climb again in the world market. Not only were the wholesalers absorbing the cost of the new tax, but now they couldn't even pass along their higher product costs to consumers because a gasoline price "freeze" was in effect.

So the administration was faced with a predicament. Lifting the freeze would mean higher gasoline prices and a violation of the pledge to keep prices down. But maintaining the freeze could drive some firms out of business.

The administration's answer was its system of credits or subsidies. But this raises a number of questions.

•Daco says the program of credits is only "temporary." But in government, "temporary" solutions often tend to become permanent, as in the case of the 45 percent hike in water rates.

•Does Daco really have the trained personnel required to administer such a complex program? For starters, we think they'll need a small army of accountants.

•Finally, the program defies logic. First, the government imposes a tax on the gasoline wholesalers, making them pay money to the government. Then, a couple of months later, the government is offering these same companies credits or subsidies, in effect paying money to them. Does the left hand know, or even care, what the right hand is doing?

We have a suggestion: the Hernández Colón administration should stop trying to artificially manipulate gasoline prices. If the administration really wants to help the consumer, it can best do so by stimulating competition in the industry and letting the market forces do the work.

---

### ON MOTION FOR STAY PENDING APPEAL

On June 5, 1986, at 4:45 P.M., the defendant filed before this Court a Motion for Stay of Judgment Pending Appeal. Defendant, as Secretary of Consumer Affairs, states that by regulating gasoline sales at the wholesale level he attempted to stop

said wholesalers from "reaping exhorbitant profits" made in recent months. *See* Motion at 1. We are told that if the injunction is allowed to take effect, consumers will suffer irreparable damages. It is argued that if a stay is granted, plaintiffs will not be significantly injured by their economic loss. Consumers, although not formal parties to this suit, have been in the Court's mind throughout these proceedings, up to this very moment.

At the outset, we state that there are three interests to consider, the government's, the consumers', and the plaintiffs'. The balancing of the interests mentioned has to be seen in light of the facts presented at trial which confirm gross violations of substantive due process considerations. The governmental interest is protected. The Law No. 5 excise tax, 13 L.P.R.A. Sec. 3040C, is being collected. The tax or its validity was not before the Court and, thus, that legitimate governmental interest directed to raising revenue, remains untouched.

The remaining balance is that of alleged irreparable damage to consumers versus actual economic deprivation to plaintiffs. In this sense, our judgment represents a careful consideration of the evidence and the law. We cannot responsibly stay our decision on the basis of the record developed, unless we accept that a watered-down version of the Constitution applies in this jurisdiction. The defendant Secretary's factual and legal course of action after the passage of Law No. 5 was directed solely to keeping a promise made to the consumers. This Court cannot be an accessory after the fact to such conduct by sanctioning constitutional violations. First Circuit precedent controls. *Mora v. Mejias*, 223 F.2d 814 (1st Cir.1955).

Fed.R.App.P. 8(a) and Fed.R.Civ.P. 62 govern the issuance of a stay pending appeal. Rule 8(a) requires a federal district court to first examine the merits of such motion. Because a district court has considered the merits of the case and, thus, is most familiar with the record, it is in a position to "exercise the nice discretion" necessary for weighing the equities of such motion. *Cumberland Tel. & Tel. v. Louisiana Public Service Comm'n*, 260 U.S. 212, 219, 43 S.Ct. 75, 77, 67 L.Ed. 217 (1922). The factual record is a critical source for the balancing of interests under Rule 8(a). The defendant Secretary has failed to alert us to the commission of a serious error in evaluating the evidence upon which we entered our findings of fact. As a matter of fact, *defendant has not disputed our findings.* Instead, the Secretary relies on his pretrial view as expressed in his previously-filed memoranda and on conclusory allegations of public injury as grounds for the stay. Here the balancing points to the fact that the defendant Secretary fails to accept that his orders placed the gasoline companies in an absurd economical predicament. In this context, defendant's undefined allegations of injury to the consuming public cannot outweigh the federally-protected constitutional interests and the concomitant expectation of plaintiffs of a reasonable profit and return on investment. *See Martínez Rodríguez v. Jiménez*, 537 F.2d 1, 2 (1st Cir.1976). The defendant Secretary's right to appellate judicial review is not impaired by this Court's order. This is not aa case where the "status quo could never be restored." *Providence Journal v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980). Our judgment of June 4, 1986 has not affected the legality of the Law No. 5 excise tax. We were careful enough in pointing out to the defendant that DACO's enabling act, 3 L.P. R.A. Secs. 341–341v, as well as Law No. 73, of June 23, 1976, 23 L.P.R.A. Secs. 1131–1135, remained intact and enforceable if not inconsistent with our judgment. As stated in our Opinion and Order, at 97–98, DACO has broad authority to regulate for the benefit of the consumers.

In sum, our factual findings controlled our ultimate decision. Because the equities of this case are strongly in favor of plaintiffs, the defendant Secretary's request for a stay is DENIED. *Ramsdell v. G.H. Cof-*

*fey Company, Inc.*, 632 F.2d 162, 163 (1st Cir.1980).

The Clerk will transmit this Order to the Clerk of the United States Court of Appeals for the First Circuit by Panafax.

IT IS SO ORDERED.